FRANK W. FRENCH v. THE DETROIT, GRAND HAVEN & MILWAUKEE RAILWAY COMPANY.

*Railroad companies—Injury to person on track—Contributory negligence.*

1. Plaintiff is held to have been guilty of negligence:

   *a*—In attempting to reach defendant's depot along its right of way in the face of a train which he knew was liable to start at any moment.

   *b*—In persisting in such attempt after the train had started, and attempting to make a given point in advance of the train.

   *c*—In attempting to board a moving train.

2. The effect and force of clear and positive testimony, coupled with corroborative circumstances, cannot be broken by the bare announcement of a highly improbable theory, which is itself dispelled by competent and uncontradicted testimony, nor by the naked statement of a party that he was confused by surroundings which he had contributed to produce.

3. The plaintiff's conduct in running some distance towards an approaching train, and neglecting to avail himself of avenues of escape which were open to him in every other direction, cannot be relieved of its negligent character by the statement that he thought he could reach a given point before the train did; nor can the railroad company be held liable for an injury, resulting from plaintiff's grasping the hand-rail of a moving car, by the bare statement that he was so confused, when he reached the position into which his own judgment had led him, that his act was involuntary.

Error to Shiawassee. (Newton, J.) Argued November 10, 1891. Decided December 30, 1891.

Negligence case. Defendant brings error. Reversed, and no new trial granted. The facts are stated in the opinion.

*Geer & Williams,* for appellant, contended for the doctrine of the opinion.

*Watson & Chapman,* for plaintiff, contended:

1. The court is not warranted in directing a verdict for the
   defendant where there is a conflict in the evidence, under any
   view of which the defendant would be liable; for this Court
   has said that, before verdict can properly be directed for the
   defendant, all of the testimony in favor of the plaintiff, bear-
   ing upon the issues given by him and his witnesses, and all
   making a case for him given on the part of the defendant, if
   accepted as true, must fail to make out a *prima facie* case,
   after the most favorable construction that can possibly be given
   to such testimony for the plaintiff; citing *Gibbons v. Farwell,* 63
   Mich. 348.

2. Under the evidence of plaintiff and his witnesses, there was a
   case made for the jury. We are willing to admit that plaint-
   iff was a trespasser, and had no right to go upon defendant's
   ground, but this was not the proximate cause of the injury,
   because if he had been left to himself, and no invitation to
   come on had been given him by the conductor, he would have
   gone off the track, and out of the way, but the conductor
   beckoned him to come on and into a dangerous place, and
   then started the train down rapidly upon him with full
   knowledge of the danger, which was a complete and interven-
   ing cause between the original trespass and the accident; and
   the defendant, having knowledge of the dangerous position of
   the plaintiff, owed him the duty of using ordinary care and
   skill to prevent an accident; citing *Beems v. Railway Co.,* 58
   Iowa, 150 (6 Amer. & Eng. R. R. Cas. 222); *Guenther v. Railway
   Co.,* 95 Mo. 286 (34 Amer. & Eng. R. R. Cas. 47); *Hays v.
   Railway Co.,* 70 Tex. 602 (34 Amer. & Eng. R. R. Cas. 97);
   *Street Railway v. Steen,* 42 Ark. 321 (19 Amer. & Eng. R. R.
   Cas. 30); *Price v. Railway Co.,* 72 Mo. 414 (3 Amer. & Eng.
   R. R. Cas. 365); *Swigert v. Railroad Co,,* 75 Id. 475 (9 Amer.
   & Eng. R. R. Cas. 322); and when the plaintiff is guilty of
   contributory negligence, the defendant will be liable only for
   such negligence on its part as occurred after it became aware
   of plaintiff's exposed condition; citing *Yarnall v. Railway Co.,*
   75 Mo. 575 (10 Amer. & Eng. R. R. Cas. 726); 2 Thomp. Neg.
   1156, 1157 (note 1); Shear. & R. Neg. (4th ed.) § 99; Whart.
   Neg. §§ 326, 327; and the same rule has been recognized by
   this Court in *Railroad Co. v. Miller,* 25 Mich. 279; *Railway
   Co. v. Smith,* 46 Id. 504; *Kelly v. Railroad Co.,* 65 Id. 190;
   *Bouwmeester v. Railroad Co.,* 67 Id. 87, 63 Id. 557.

3. One in a perilous position brought on him by defendant's negli-
   gence is only required to act honestly and use his best judg-
   ment, and it is a question for the jury whether he acted rashly

under undue apprehension of danger; citing *Lowery v. Railway Co.*, 99 N. Y. 158 (23 Amer. & Eng. R. R. Cas. 276), *Railway Co. v. Ware*, 84 Ky. 267 (27 Amer. & Eng. R. R. Cas. 206); *Voak v. Railway Co.*, 75 N. Y. 320; *Schultz v. Railway Co.*, 44 Wis. 638; *Railway Co. v. O'Connor*, 77 Ill. 391; *Railway Co. v. Carr*, 35 Ind. 510; and if a person is placed by the fault of a railroad company in a position of peculiar peril, the company will not be absolved from liability because he does some act which turns out not to have been the most judicious course under the circumstances; citing 14 Amer. & Eng. R. R. Cas. 639, 662 (notes); 17 Id. 578 (note).

McGRATH, J. Plaintiff had his right leg crushed by defendant's cars in August, 1889, and brings this suit for damages.

The passenger depot building at Owosso is about 75 rods west from Washington street. The east end of the freight-house is about 300 feet from the east end of the depot building. Plaintiff came by rail from Chesaning on the morning of the day on which the accident occurred, and desired to take the east-bound train for Corunna, on defendant's road. Plaintiff knew all about the location of the depot, and the usual route thereto, but, instead of taking the street leading to the depot, he came down Washington street to the defendant's right of way, and, seeing defendant's train at the depot, started west, facing the train, on said right of way, on a run to take the train. He claims that he ran towards the depot between the main track and side track No. 12, which adjoined the main track on the north. This side track started east of Washington street, and continued west to a point about 150 feet east of the passenger depot. He further claims that there were cars at intervals upon track No. 12; that, as he reached an opening between two of these side-tracked cars, he saw the passenger train start, and move from three to five feet, whereupon he halted, intending to get between the cars on the side track out of the way; that the conductor then observed him, called

upon the engineer to hold on, and beckoned plaintiff to come on; that plaintiff then started on a run towards the train, and then observed that the train had started again; that the train met him at one of these side-tracked cars, which he was trying to get west of so as to avoid injury; that the suction of the train drew him towards it, and he caught hold of the hand-rail of one of the cars, and was thrown under the car. He says:

"The last I remember, the end of the car was just passing me as I stood facing the south, when the hand-rail struck me across the arm, here. I believe I gripped that rail. I can't swear I did. That is the last I remember. * * * * *

"Q. I want to ask you whether you were trying to catch on that train?

"A. I was not. I never have said so; never had any such idea in my mind. * * * * * * * *

"I was on the north side of the main track. There were freight-cars on the first side track. They were in two sections. I can't state the number in each. I should say four to eight in each section. Part of them were box-cars and some flat-cars. The flat-cars had a railing standing up about that high (illustrating). There was a box-car opposite where I was hurt, and I was very near the west end of the box-car; I don't think to exceed five feet. I was trying to get to the west end of the box-car that was standing there when the train came along. There was nothing further on west of the box-car on that side track. I was still running. I couldn't stop. I was under motion. When these cars passed me, I was still running west. * * * *I can't tell whereabouts on this track I was injured. I don't know how far the train may have rolled me or tumbled me. * * * While the train was starting towards me, I was in motion all the time. Just where I was at that time I can't say. I was trying to get to that point as the train was starting up. I was not at that point when the train started. I was running. * * * The conductor motioned and hallooed to the engineer to hold on. The engineer stopped his engine, and I immediately started again. * * *

"Q. Now, as I understand you to say, you didn't catch

hold of the handles, the platform of the cars, as they went past?

"*A*. Not to my knowledge. I had no intention to catch.

"*Q*. I ask you if you will swear you did not catch hold of the rails of the platform of those cars that day as they went past you?

"*A*. I will not swear I did or did not.

"*Q*. Will you swear you did not?

"*A*. No, sir.

"*Q*. Will you swear you didn't have hold of the rails of the platform of that car as it went by you, and were hanging on to it?

"*A*. Not to my knowledge.

"*Q*. Will you swear, when the train reached you at that point, you didn't spring and grasp the rails of the car?

"*A*. Yes, sir; I will.   *   *   *   It was a question whether my hand would strike the car or go between the coaches. The last I knew, the railing struck me there (illustrating). This hand was not showing any marks of gripping. This hand, especially these three fingers, and the whole arm, and my side indicated a severe wrench; black and blue on the inside of my hand. I must have caught hold of the rail as it passed me with these fingers. It jerked me, and threw me, and whirled me around. I was facing the west—running west—when the train passed me, and the train going east.

" When the train started up the second time, I was between the break in the cars and the point where the train struck me. I was less than one freight-car length west of the break when he signaled me. I still continued to advance towards the west. When he signaled me I kept on. There was the break in the cars,—the space between the cars standing on the track. Just about as I passed the east end of that car, I heard the steam escaping, and saw the drive-wheels move a trifle, and the train moved. My motion carried me by. I was endeavoring to stop, and come back, and go into that space out of the way; and, when I was two-thirds or three-fourths the length of a freight-car that way, the signal was given to come on. Then I continued to run, thinking I could get there.   *   *   *   I can't locate exactly how far I was from the station at the time this train

passed me. I don't know whether it was 150 feet or not. I don't know how much speed that railroad train would have reached at the time it got to me. There was suction enough so that I had to grab my hat to keep it from going. I think it was the suction that drew me in.    *    *    *    *    *    *    *    *    *    *

"I can't say how many seconds it was after the train started before it was upon me. It was a very short time. I can't say how many feet I had an opportunity of traveling while that train was coming down on me. If I expressed an opinion on that matter, I should say perhaps 20 or 30 feet; possibly 35 feet; I was under good headway; possibly 40,—paces, I mean. I didn't go across to the south side of the track, because I did not think there was any better chance on the south side.    *    *    *

"Q. You say, after the train left the depot, you still continued to run towards it some 30 or 40 feet, or paces. Which did you mean to say?

"A. About the length of two cars.

"Q. You went right along by the place where the two cars broke open?

"A. I didn't go by more than one such place. I supposed I could get to the end. My judgment told me to go on, and get to the end, and out of the way, as the safest way to do.

"Q. You went by an opening that you could have stepped into?

"A. I didn't see it or think about it.    *    *    *    I did not notice any opening at the right of me between the cars after the train started. I did not think of it. The way I was going seemed to be the only safe way to get out. That was my judgment, which I acted upon. I think I must have passed one of these openings, but I didn't notice it at the time. I believe now I did, but I didn't know it. My judgment told me to get there, where I could get over here; and I tried, and failed in it."

Plaintiff was recalled after dinner, and, being examined by Mr. Chapman, testified as follows:

"I remember this forenoon of stating that I thought I ran 30 or 40 feet after the train started. This noon I procured a tape-line, and measured 30 feet. I think I said 20 to 30 feet. I am positive I did not go that far. That is a longer distance than I thought. I don't know

how far I traveled before the train started down on me.

" *Q.* What do you say about it now?

" *A.* I say, as I said this forenoon, I am no hand to estimate distances. I think I said 20 to 30 feet. I am positive I did not go that far. That is a longer distance than I thought. The distance I had in my mind was all right, but I didn't guess the distance right. That is something I can't do. Some people are experts at that, and can guess at distances, but I never could.

" *Q.* Have you any idea at the present time how far you traveled after that train started down on you?

" *A.* I can't say. I would not make an estimate. I was mistaken in trying to make an estimate. I know I went a very short distance. I hadn't time to go but a very short distance."

Plaintiff was recalled at the close of defendant's case, and testified as follows:

" *Q.* Did you make a leap to catch that train, as described by the witness Gray and these other two witnesses?

" *A.* I had in my mind no intention—

" *Q.* I don't care about what you had in your mind. I didn't ask you your mind. I asked you if you made any attempt to reach that train.

" *A.* I did not.

" *Q.* Did you make any effort to catch on the train?

" *A.* I did not."

*Cross-examination:* "I was facing the west when the train passed me. The engine had passed me, so I was at the time about the center of the baggage-car. I grabbed at my hat just about the time the latter part of the tender passed me.

" Q. Will you swear to it that you did or did not grab or grasp at the handles of that car?

" *A.* I stated I believed—

" *Q.* Answer the question ' Yes' or ' No.' Will you swear to it that you did or did not grasp at the handles of the car as it went by you?

" *A.* I don't know."

Plaintiff's witness Cole says:

" *Q.* Now, when the train came down on French, what did he do?

"*A.* He looked as though he was leaning right back against the car.

" *Q.* What next did you see?

"*A.* I saw him just as though he plunged right into the cars."

Plaintiff's witness Warren says that French was picked up west of the cars on track 12, and just east of the freight-house; and plaintiff's witness Wright says there were no cars on track 12 at the point where French fell. Cole is the only one of plaintiff's witnesses who saw plaintiff before he fell.

Defendant's witnesses Lehman, Chipman, Burk, Knight, Wikes, Finch, and Gray testify that plaintiff was picked up 100 feet west of the last car on the No. 12 track, and several of them say that he was carried east from 15 to 20 feet by the train.

Kipp, a carpenter, who happened to be at the depot, says that plaintiff had passed the cars on track 12, when he grabbed the train to catch on; that there were no cars on No. 12 at that point; and that the train had got about twice its own length from the depot.

Gray, flagman at the crossing, says:

"The train started up, and he started to run. When the engine passed him, he squared himself, and made a dive right for the train,—reached for the cars,—and the next thing I saw was somebody thrown over, and his hat thrown away across the 12 track. It appeared to me that there was one flat-car on the 12 track between me and him, and one beyond me, but near to my crossing. He was 20 or 30 or 40 rods past that. I saw him pass the car. He ran until he met the train. I saw the train start from the station. She started, and came right along. It did not stop anywhere. There were no cars on that 12 track near where he caught on to the train. Mr. Kipp was sitting by me when French passed by the track. When the train started, I got up off the bench. My attention was called to him to see whether he would attempt to get on the train or not, at the speed she was coming. He kept in the space between

the main track and the 12 track until he got past the flat-car and opposite the engine. Then he stepped to the north side of that space, and kept on. There was nothing to hinder Mr. French from stepping away from the train instead of stepping towards it, when he attempted to get on."

Burk, a butcher, says:

"I saw French clinging to the passenger-car, and saw him when he fell. He fell from the step from where he was clinging, at the side of the car, to the ground between the first track and the main track, opposite the east end of the freight-house platform. The ground about him was clear, I think, of cars, for as much, I should say, as 20 or 30 or 40 or 50 feet."

Chapman says:

"When I first saw French, he was running to catch the train. He was right about just ready to make for the train when I saw him. He was down about opposite the east end of our new platform. He was running to catch the train,—running towards it. He ran a few feet towards me, and turned, and jumped, and caught the train either on the rear end of the baggage-car or on the front end of the smoking-car. He jumped for the railing. As soon as I saw the man make for the cars, I saw his foot slip. He was carried, I should say, 15 or 20 feet by the train as he grabbed it."

Knight says:

"When the passenger car was at the station, I stood about the rear end of the baggage-car, from four to six feet from the main track. The train started out in the usual way. As the rear end of the train pulled by me, there was no one on the rear steps. At the same time as the rear end of the train pulled by me,—it was almost in a direct line east of me,—I saw Mr. French come running down the track. I didn't know who it was at the time. I saw him coming running down the track between the two tracks. He was about 25 or 50 rods down the track, running west, between the 12 track and the main line. He continued to run until he met the train. Then he stopped running. He had hardly stopped when he

grabbed at the front end of the smoking-car. He seemed to hang a minute. He did hang there for a few minutes. He was taken some 10 or 20 feet. I thought to myself, 'He is going to succeed in getting on,' and then I saw him fall to the ground."

The conductor and engineer both testify that the train started but once; that the engineer was not signaled to stop; that neither saw the plaintiff; that the only signal given was that to start; and that the only words spoken aloud by the conductor were the usual "All aboard!" And these witnesses are corroborated by others; but there was a conflict of testimony upon these points. It is undisputed, however, that the conductor immediately boarded the train after giving the signal, and that the train started at once. Plaintiff testifies that the train started again immediately.

The plaintiff's theory, that he was drawn into the train by the suction of the train while he was opposite the car on track 12, is an improbable one, to say the least, and was clearly dispelled, not only by the testimony as to the probable speed of a train that had but just started, by the testimony of men of long experience about moving trains, but by the circumstances, which unmistakably indicate that plaintiff had passed the car on track 12, and that he was endeavoring, at the time of the injury, to board this train.

Plaintiff was guilty of negligence:

1. In attempting to reach the depot along defendant's right of way in the face of a train which he knew was liable to start at any moment.
2. In keeping on after the train had started, and attempting to make a given point in advance of the train.

Immediately after the signal given by the conductor, plaintiff saw the train start. He says he saw the drive-wheels move. At this time he must have been at least

500 or 600 feet from the locomotive. An ordinarily prudent man would have realized either that he had mistaken the signal, or that the conductor intended to disregard it, and would have got out of the way; but he kept on running in the face of the moving train and the cars on track 12, and met the train about 350 feet from the depot. He says that he ran by an opening between the cars on track 12, into which he could have stepped and been out of danger; that his judgment was that he could make the next opening. Why make it unless he intended to attempt to board the train? He was in no imminent peril when he saw the train start towards him, nor while he was passing the opening in the cars on track 12; neither does it appear that there was any obstruction on the south side of the main track. When he saw the train start after the signal, he was 500 or 600 feet from the train, and he ran at least 200 feet to meet it. His judgment, or want of judgment, led him into imminent peril.

3. In attempting to board a moving train.

He does not deny that he caught on to the hand-rail, but attempts to explain the act by saying that he was confused. His own conduct led him to the point where he became confused; and the fair and only reasonable inference that can be drawn from his testimony is that he made that point intending to board the train. All the circumstances, and the testimony of all the other witnesses, point in that direction. When he took hold of the hand-rail, he was in an open space. No cars prevented his stepping to the north, out of the way of the train. The only testimony offered to negative the existence of a purpose on the part of plaintiff to board the train was his own statement (1) that the suction of

the train drew him towards it; and (2) that he was confused.

The effect and force of clear and positive testimony, coupled with corroborative circumstances, cannot be broken by the bare announcement of a highly improbable theory, which is itself dispelled by competent and uncontradicted testimony, nor by the naked statement that he was confused by surroundings which he had contributed to produce. There is a lack of clearness, and a remarkable indefiniteness, which characterizes plaintiff's entire testimony. The plaintiff's conduct in running some distance towards an approaching train, and neglecting to avail himself of avenues of escape which were open to him in every other direction, cannot be relieved of its negligent character by the statement that he thought he could reach a given point before the train did; nor can the defendant be held liable for an injury, resulting from his grasping the hand-rail of a moving car, by the bare statement that he was so confused, when he reached the position into which his own judgment had led him, that his act was involuntary.

The court erred in refusing to direct a verdict for defendant, and the judgment must therefore be reversed, with costs of both courts, without a new trial.

MORSE, LONG, and GRANT, JJ., concurred.