BAKER *et al.* v. THE KANSAS CITY, FORT SCOTT & MEMPHIS RAILROAD COMPANY, *Appellant.*

### In Banc, June 4, 1894.

1. **Railroad:** NEGLIGENCE: FLYING SWITCH: HIGHWAY CROSSING. A railroad is guilty of negligence in making a flying switch over a highway crossing, and this is true, although there is a person on the detached cars performing the duties of a brakeman.

2. ——: ——: TRAVELER: HIGHWAY CROSSING. When a traveler on a highway approaches a railroad crossing, he must look both ways and listen for coming trains, and the negligence of the company in not giving proper signals will not excuse the traveler's duty to so look and listen.

3. ——: ——: ——: QUESTION FOR JURY. The foregoing rule is, however, relaxed where the surroundings are of a character to prevent the traveler from seeing or hearing the train, or where the circumstances are so complicated as to deceive the traveler and throw him off his guard; in such cases, whether he used due care and caution is a question for the jury to determine.

4. ——: CONTRIBUTORY NEGLIGENCE: BURDEN OF PROOF. The burden of showing contributory negligence rests on the defendant.

5. ——: ——: NONSUIT: QUESTION FOR JURY. A nonsuit because of plaintiff's contributory negligence will not be granted, where his evidence simply tends to show such fact; if different inferences can be drawn from the evidence, the jury, and not the court, must determine the question of contributory negligence.

6. ——: NEGLIGENCE: HIGHWAY CROSSING: DETACHED CARS. Whether a woman whose team was run into at a highway crossing by detached cars following a train was guilty of contributory negligence, was, under the circumstances of this case, a question for the jury.

7. **Practice:** BILL OF EXCEPTIONS: AMENDMENT. An amendment to a bill of exceptions can be made, notwithstanding the judge who signed the bill is out of office.

8. ———: INSTRUCTIONS, PROOF OF LOSS OF. Proof of the loss of an instruction can be made as in the case of any other record.

9. ———: INSTRUCTIONS. The expression "at a dangerous rate of speed" used in an instruction given in an action for injuries caused by a railroad train means at a dangerous rate of speed "under the circumstances."

10. Supreme Court Practice; CONFLICTING INSTRUCTION: HARMLESS ERROR. The fact that an erroneous instruction given at defendant's request, declaring that certain facts would, as a matter of law, constitute contributory negligence, is conflicting and inconsistent with correct instructions given at plaintiff's request and of the court's own motion, leaving it to the jury to determine such contributory negligence as a question of fact, is not a ground for reversing the judgment, where the defendant appeals. (BLACK, C. J., and MACFARLANE, J., *dissenting*).

*Appeal from Bates Circuit Court.*—HON. D. A. DEARMOND, Judge.

REVERSED AND REMANDED.

*Wallace Pratt, C. W. Blair* and *I. P. Dana* for appellant.

(1) Mrs. Baker was guilty of negligence contributing to, if not causing, her injuries, and, therefore, was not entitled to recover for them. Beach on Contributory Negligence, sec. 63; Patterson's R'y Accident Law, p. 168, *et seq.; Boyd v. Railroad*, 105 Mo. 371; *Harlan v. Railroad*, 64 Mo. 480; *Turner v. Railroad*, 74 Mo. 607; *Kelley v. Railroad*, 75 Mo. 138; *Tucker v. Railroad*, 23 N. E. Rep. (N. Y.) 916; *Stepp v. Railroad*, 85 Mo. 235; *Shaw v. Railroad*, 104 Mo. 648; *Hunter v. Railroad*, 23 N. E. Rep. (N. Y.) 9; *Artz v. Railroad*, 34 Iowa, 159; *Railroad v. Elliott*, 28 Ohio St. 340; Wharton on Negligence, secs. 382, 384; *Eswin v. Railroad*, 96 Mo. 297; *Railroad v. Adams*, 33 Kan. 427. (2) And this is true, even though defendant failed to give the statutory signals for the crossing. *Butterfield v. Foster*, 11 East,

60; *Railroad v. Goddard*, 25 Ind. 185; *Hudson v. Railroad*, 101 Mo. 35; *Rodrian v. Railroad*, 26 N. E. Rep. (N. Y.) 741; *Mehegan v. Railroad*, 26 N. E. Rep. (N. Y.) 936; *Railroad v. Dinseman*, 16 S. W. Rep. (Ark.) 169; *Railroad v. Houston*, 95 U. S. 702; *Dlauhi v. Railroad*, 105 Mo. 645; *Fletcher v. Railroad*, 64 Mo. 484; *Zimmerman v. Railroad*, 71 Mo. 478; *Henze v. Railroad*, 71 Mo. 636; *Hixson v. Railroad*, 80 Mo. 335; *Kelley v. Railroad*, 88 Mo. 534; *Yancey v. Railroad*, 93 Mo. 433; *Railroad v. Loomis*, 13 Ill. 548. (3) And it is equally true if defendant was negligent in any respect alleged in the petition, for her negligence concurred with defendant's and barred her recovery. *Skelton v. Railroad*, L. R. 2 C. P. 631; *Fletcher v. Railroad*, 21 N. E. Rep. (Mass.) 302; *Daniels v. Railroad*, 26 N. E. Rep. (N. Y.) 466; *Butts v. Railroad*, 98 Mo. 272; *Scott v. Railroad*, 16 N. Y. Supp. 350; *Clark v. Railroad*, 50 N. W. Rep. (Minn.) 365; *Olson v. Railroad*, 50 N. W. Rep. (Wis.) 412. (4) There was no proof that defendant was negligent in any respect alleged in the petition. *Rafferty v. Railroad*, 91 Mo. 33; *Bell v. Railroad*, 72 Mo. 50; *Express Co. v. Smith*, 33 Ohio St. 519; R. S. 1889, sec. 2608. (5) The first instruction given for plaintiff was erroneous and improper. *Barr v. Armstrong*, 56 Mo. 589; *Vanhooser v. Berghoff*, 90 Mo. 487; *Schlereth v. Railroad*, 96 Mo. 509; *Mathiasen v. Mayer*, 90 Mo. 585; *Stepp v. Railroad*, 85 Mo. 229. (6) The instruction given by the court of its own motion was erroneous and improper. *Frederick v. Allgaier*, 88 Mo. 598; *Price v. Railroad*, 77 Mo. 508; *Waldhier v. Railroad*, 71 Mo. 514; *Newell v. Iron Co.*, 5 Mo. App. 253; *Chouteau v. Iron Works*, 83 Mo. 83; *Jones v. Jones*, 57 Mo. 138. (7) Defendant's instructions numbers 1, 4, 5, 6, 7, 11, 12, 13, 14 and 15 should have been given. (8) The amount of the verdict was excessive. (9) The circuit court erred in holding that it had no power to

amend the bill of exceptions because the case was not tried before, nor the bill signed by, the then judge thereof, but before and by his predecessor. *Darrier v. Darrier*, 58 Mo. 233; *De Kalb Co. v. Hixon*, 44 Mo. 342; *Pockman v. Meatt*, 49 Mo. 345; *Gibson v. Choteau's Heirs*, 45 Mo. 173; *Hansbrough v. Fudge*, 80 Mo. 308; R. S. 1889, secs. 2171, 2172. (10) Also in holding that it had no such power because there did not appear to be any records, minutes, docket entries or papers on file in the cause from which the amendment could be made, and in finding that there did not appear to be any such papers on file. *Robertson v. Neal*, 60 Mo. 579. (11) In not finding conclusively that no instruction 23 was asked by or given for defendant.

*Gates & Wallace* for respondent.

(1) The act of the defendant in running its train in sections across this highway with the view obstructed, in order to save time in making as witch, was gross, if not criminal negligence. It was an act of negligence. *per se. Brown v. Railroad*, 32 N. Y. 597; *O'Connor v. Railroad*, 94 Mo. 150; *Railroad v. Converse*, 139 U. S. 469; *French v. Railroad* 116 Mass. 537; *Ferguson v. Railroad*, 63 Wis. 145; *Butler v. Railroad*, 28 Wis. 487; *Conley v. Railroad*, 12 S. W. Rep. (Ky.) 764; *Railroad v. Schmidt*, 126 Ind. 290; *Railroad v. Batches*, 55 Ill. 379; *Railroad v. O'Shields*, 90 Ala. 29. (2) The plaintiff was not guilty of contributory negligence. This was a question for the jury, and upon which the defendant had the burden of proof. The jury decided it against the appellant. *Ferguson v. Railroad*, 63 Wis. 145; *French v. Railroad*, 116 Mass. 537; *Brown v. Railroad*, 32 N. Y. 597; *Conley v. Railroad*, 12 S. W. Rep. (Ky.) 764; *Butler v. Railroad*, 28 Wis. 487; *Howard v. Railroad*,

32 Minn. 214; *O'Connor v. Railroad*, 94 Mo. 150; *Railroad v. Converse*, 139 U. S. 469; *Donohue v. Railroad*, 91 Mo. 357; *Kelley v. Railroad*, 101 Mo. 67; *Dixon v. Railroad*, 104 Mo. 491; *LeMay v. Railroad*, 105 Mo. 361. (3) There was no error in giving ing instruction number 1 on the part of the plaintiff. An instruction similar to this was approved in *O'Connor v. Railroad*, 94 Mo. 156. (4) There was no error in giving the instruction given by the court of its own motion. (5) The court did not err in refusing the instructions asked by the appellant numbered, from 1 to 15 inclusive. *First.* The appellant asked twenty-three instructions, which would have been sufficient cause for refusing them all. *Crenshaw v. Sumner*, 56 Mo. 517; *Deshberger v. Harrington*, 28 Mo. App. 632; *Renshaw v. Ins. Co.*, 33 Mo. App. 394; *Hannibal v. Richards*, 35 Mo. App. 15; *Kinney v. Springfield*, 35 Mo. App. 97; *McAllister v. Barnes*, 35 Mo. App. 668; *Norton v. Railroad*, 40 Mo. App. 642; *Flynn v. Railroad*, 43 Mo. App. 436. *Second.* The instructions given stated the law of the case fully and were more favorable to defendant than it was entitled to. *Third.* The failure of the appellant to preserve in the record instruction number 23 which was given at its request, forbids the court from considering the refused instructions. (6) Because of the failure of the appellant to preserve in the record the instruction number 23, which was given at its request, this court can not say that the court below committed any error, either in giving or refusing any of the instructions; for the reasons, *first*, that any errors committed, if there were any (which is not admitted), might have been invited by the appellant in said twenty-third instruction, and, *secondly*, the said instruction might have contained everything that the appellant was entitled to ask in the refused instructions. *Greenbaum v. Millsaps*, 77 Mo. 474; *Berney v. Sharp*,

78 Mo. 73; *Porth v. Gilbert*, 85 Mo. 125; *Wilkerson v. Railroad*, 26 Mo. App. 144; *Davis v. Hilton*, 17 Mo. App. 319; *Elliott v. Rosenberg*, 17 Mo. App. 667; *Hoyt v. Quinn*, 20 Mo. App. 73. (7) The damages found by the jury were not excessive. This was a question for the jury and their verdict will not be disturbed, unless it was clearly the result of passion or prejudice. *Harrold v. Railroad*, 24 Hun, 184; *Groves v. Rochester*, 39 Hun, 5; *Railroad v. Holland*, 18 Ill. App. 418; *Alberti v. Railroad*, 43 Hun, 421; *Railroad v. Thompson*, 64 Miss. 584; *Woodbury v. District*, 5 Mackey, 127; *Railroad v. Dorsey*, 66 Tex. 148; *Schultz v. Railroad*, 46 N. Y. Superior Ct. 211; *Shaw v. Railroad*, 8 Gray, 47; *Walker v. Railroad*, 63 Barb. 260; *Waldier v. Railroad*, 87 Mo. 37; *Barksdull v. Railroad*, 23 La. Ann. 180; *Dougherty v. Railraod*, 97 Mo. 647; *Robinson v. Railroad*, 48 Cal. 409; *Porter v. Railroad*, 71 Mo. 66; *Belair v. Railroad*, 43 Iowa, 662; *Railroad v. Parks*, 88 Ill. 373; *Hanlon v. Railroad*, 104 Mo. 381. (8) A party can not complain of an instruction given at his request. *Chamberlain v. Smith*, 1 Mo. 482; *Flowers v. Helm*, 29 Mo. 324; *Crutchfield v. Railroad*, 64 Mo. 255; *Tetherow v. Railroad*, 98 Mo. 74. (9) A party can not try his case on one theory and then in this court complain that it should have been tried on another and different one. *Leabo v. Goode*, 67 Mo. 126; *Walker v. Owen*, 79 Mo. 563; *Bank v. Armstrong*, 62 Mo. 65; *Tomlinson v. Ellison*, 104 Mo. 105. (10) This court has repeatedly held that it will not reverse a case on the ground of erroneous instructions, when the appellant asked and obtained instructions involving the same error. *Smith v. Culligan*, 74 Mo. 388; *Garesche v. College*, 76 Mo. 332; *Holmes v. Braidwood*, 82 Mo. 610; *Noble v. Blount*, 77 Mo. 235; *Fairbanks v. Long*, 91 Mo. 628. (11) If a party has sustained no injury from the instruction

given, it is immaterial whether the instruction is erroneous or not. *Swearingin v. Orne,* 8 Mo. 707; *Vaulx v. Campbell,* 8 Mo. 224; *Bellissime v. McCoy,* 1 Mo., 318; *Slate v. Burr,* 81 Mo. 108; *Ridenhour v. Railroad,* 102 Mo. 270; *Fugate v. Millar,* 109 Mo. 280; *McGrew v. Railroad,* 109 Mo. 582. (12) If a party can gain an advantage in this court from an error committed at his own request by the court below, what becomes of the long line of decisions which hold that this court will not consider objections to the action of the lower court in giving or refusing instructions which were not assigned as error in the motion for a new trial. *Cowen v. Railroad,* 48 Mo. 556; *Gaines v. Frender,* 82 Mo. 497; *State v. Grimes,* 101 Mo. 188; *Haynes v. Trenton,* 108 Mo. 123. (13) Indeed, objections to instructions can not for the first time be taken on a motion for a new trial. The record must show that exceptions were taken to them at the time they were given, otherwise they will not be entertained by the supreme court. *Powers v. Allen,* 14 Mo. 367; *Dozier v. Jerman,* 30 Mo. 216; *State v. Elvins,* 101 Mo. 243. Appellant could not have objected, at the time, to an instruction it asked itself; neither is it one of the grounds for which it asked a new trial below. (14) The following cases are cited in Judge BLACK's opinion, in support of the proposition that to give conflicting and inconsistent instructions is reversible error. *Pond v. Wyman,* 15 Mo. 181; *Henschen v. O'Bannon,* 56 Mo. 289; *Frederick v. Allgaier,* 88 Mo. 598; *Stone v. Hunt,* 94 Mo. 475. (15) On the other hand, although conflicting instructions are given, yet if those given by the court of its own motion and those given for the respondent are correct, and the error is in the instructions given at the request of the appellant, then the case should be affirmed. *Wilkins v. Railroad,* 101 Mo. 93; *Reardon v. Railroad,* 114 Mo. 384.

DIVISION ONE.

BLACK, C. J.—This was an action to recover damages for personal injuries sustained by the plaintiff, while she was attempting to pass over the defendant's railroad tracks with a two horse team and farm wagon, at a point where the tracks cross a highway near the southern limits of the town of Rich Hill.

It is earnestly insisted that there is no evidence of negligence on the part of the defendant; that the plaintiff was guilty of contributory negligence, and that the trial court should have ruled both of these questions for the defendant as a matter of law.

The record discloses the following facts: The railroad tracks run nearly east and west, and the highway runs nearly north and south at the crossing. The plaintiff was traveling towards the north. When she reached a point from eighty to one hundred and twenty-five feet south of the railroad crossing, a train of cars composed of an engine, caboose and four flat cars passed over the crossing going east. After the train passed, the plaintiff drove on, and, while on the second or main track, five detached box cars following after the train struck the wagon.

The train was at first composed of all of the cars before mentioned. The conductor desired to take out the four flat cars and place them on what is called the brickyard switch, which was some distance east of the crossing. When at a point about four hundred feet west of the crossing he caused the five rear box cars to be detached, and the engine then ran on east over the crossing with the caboose and flat cars with a view of setting the flat cars in on the brickyard switch. The five detached box cars followed the train on a down grade in charge of the conductor who was on top of them. He says he saw the plaintiff when he was two

hundred and fifty feet west of the crossing, that she was then one hundred or one hundred and fifty feet south of it, that she could have seen the moving box cars if she had looked, that he whistled and hallooed to give her warning, that when he got within one hundred feet of the crossing he saw she did not notice the cars, that he then set the brake on the forward car and then on the second one and jumped off. He says he jumped off because he knew the cars would strike the wagon and he thought the collision would ditch the cars. Several other witnesses say the conductor shouted to the plaintiff before he began to set the brakes. One of them, who stood about one hundred and fifty feet from the crossing, says the box cars were from seventy-five to one hundred feet from the crossing when he first heard the shouts of the conductor, and it was then that the conductor began to set the brakes. The box cars were moving at a rate of speed variously estimated at from five to twelve miles per hour.

The highway south of the railroad was, in general, level. At a point fifteen or twenty feet south of the crossing it was four or five feet lower than the railroad tracks, and some two feet lower at a distance of one or two hundred feet further south. An engine house and coal bin stood west of the crossing and south of the main track, so that they obstructed, to some extent, at least, plaintiff's view of the box cars as they moved towards the crossing. According to the measurements made, the east end of the coal bin was about one hundred feet west of the center of the main track crossing. This structure stood on posts four feet, four inches above the ground, and the box part was two feet, four inches higher. It was sixty-four feet long, extending west nearly parallel with the main track. There was a space of twenty-five feet between the west end of the bin and the engine house. There is evi-

dence to the effect that a person in a wagon on the highway at a point from one hundred to one hundred and fifty feet south of the crossing could look over the bin and see the upper part of box cars moving on the main track, and there is other evidence to the effect that the bin stood on ground higher than the highway, so that the line of vision would be above the box cars.

In going north the plaintiff first came to two spur tracks, and twenty or twenty-five feet further north she came to the main track, the place where the cars struck the wagon. As the coal bin was one hundred feet west of the crossing, it is evident that a person one hundred feet south of it in a wagon on a highway would have a full view of at least one hundred feet of the main track from the crossing west; and the extent of this view would increase as the person approached the tracks.

The evidence shows that the plaintiff had often passed over this crossing and was familiar with the surroundings. Being asked if she looked west, she said: "Well, I do not say for sure that I looked, but I always do look and I think I must have looked that time; if I failed to look it was the first time." And to another like question she said: "Well, I always looked before I drove on the track, and if I failed to look that time it was the first, but to the best of my knowledge I looked each way. She had previously said "I was driving when the engine passed on, and of course when I saw it was out of the way I drove on; I know I was not out of a good walk." When she got on the main track she gave her horses a stroke with the lines. Of the four witnesses who saw her and heard the conductor halloo, two did not know which way she was looking, and two thought she was looking east toward the train she had passed. It is manifest that she did

not hear the shouts of the conductor, nor did she see the box cars until she got on the main track. She had a hood on her head, which was produced in court. Some of the evidence tended to show that it interfered with her hearing, and some of it is to the contrary effect.

1. As to the first objection we have no hesitancy whatever in saying there is an abundance of evidence of negligence on the part of the defendant. The right of the public to use the highway is equal to that of the defendant; and the defendant was in duty bound to manage the movement of its cars accordingly. The practice of making a flying switch over a highway has been condemned as a negligent act time and again by this and other courts. Here the evidence of the conductor shows that the five box cars were detached from the moving train and allowed to run on a down grade at a rate of at least six miles per hour. The engine having been detached no signals could be given by ringing the bell or sounding the whistle, one of which a person traveling on the road has a right to expect. That the defendant was negligent, notwithstanding there was a person on the box cars performing the duties of a brakeman, is too clear to call for further discussion. *O'Connor v. Railroad*, 94 Mo. 150; Beach on Cont. Neg. [2 Ed.], sec. 217; *French v. Railroad*, 116 Mass. 537; *Brown v. Railroad*, 32 N. Y. 597; *Railroad v. Converse*, 139 U. S. 469; *Ferguson v. Railroad*, 63 Wis. 145; *Railroad v. Schmidt*, 126 Ind. 290.

2. A person crossing a railroad must observe due care, and out of this general rule there has arisen the valuable and more specific rule that when one approaches a point where the highway is crossed by a railroad, he must look both ways and listen for approaching trains before he proceeds to cross the track, and this he must do, whether walking, mounted,

or in a vehicle of any kind. A failure to look and listen is of itself negligence and will defeat a recovery, though the company may have been guilty of negligence in not giving the proper signal. *Fletcher v. Railroad*, 64 Mo. 484; *Zimmerman v. Railroad*, 71 Mo. 476; *Purl v. Railroad*, 72 Mo. 168; *Stepp v. Railroad*, 85 Mo. 229; *Donohue v. Railroad*, 91 Mo. 357; *Butts v. Railroad*, 98 Mo. 272.

But the rule before stated is not so unyielding that it must be applied in all of its rigor under all circumstances. It is well settled that the person traveling on the highway is not guilty of contributory negligence because of a failure to look and listen when the surroundings are such that he can not see or hear an approaching train. *Johnson v. Railroad*, 77 Mo. 546; *Donohue v. Railroad*, *supra*; *Kenney v. Railroad*, 105 Mo. 270; *Petty v. Railroad*, 88 Mo. 306. Though the circumstances are such as to render looking and listening of no avail, it is still the duty of the traveler to use care and caution. But, when the view of the railroad is obstructed so as to render it difficult or impossible to see an approaching train, the question whether the traveler was wanting in due care is one for the jury to determine; and it is also a question for the jury under complicated circumstances calculated to deceive and throw the traveler off his guard. Beach on Cont. Neg. [2 Ed.], sec. 195.

Applying these principles to the case in hand, it is clear that the trial court did not err in refusing to nonsuit the plaintiff. It is to be observed in the first place that, under our rulings, the burden of showing contributory negligence is upon the defendant. The court can only direct a nonsuit on such a ground where the plaintiff's evidence discloses facts which, in law, amount to contributory negligence. It is not enough that the plaintiff's evidence may simply tend to establish such a

state of facts. If different inferences can be drawn from it, then it is for the jury, not the court, to find the facts. Now, it does not stand conceded on the plaintiff's evidence that she did not listen. It is true she had a hood on her head, and it is true she did not hear the shouts of the conductor; but there is evidence that the hood did not materially affect her hearing, and there is evidence that the conductor made no effort to give her warning after the cars had reached a point one hundred feet west of the crossing. Whether she did or did not listen was a question for the jury. She gave it as her belief that she looked west, and it seems quite reasonable to say that she did look west before the engine and cars attached thereto passed the crossing.

The only material facts which can be said to stand conceded, and upon which to base a nonsuit, are these: That in approaching the crossing she did not stop her team; that she did not look to the west *immediately* before she drove upon the first track; that she could have seen the approaching box cars at the time had she then looked west. On the other hand, there is much evidence to the effect that she could not see the box cars until they passed the coal bin. The station at Rich Hill was a small one, and some of the evidence is to the effect that she was but eighty feet south of the track when the engine and cars passed east. She saw the train pass, and when it had passed she would naturally infer that the way was clear, there being no other locomotive at or about the station. It will not do to say that this case stands precisely as it would had these detached cars been a regular train drawn by an engine. No case to which we have been cited supports such a proposition.

This case is in all material respects like that of *French v. Railroad*, 116 Mass. 537. There a lady was

VOL. 122—35

injured while on a crossing, in an open carriage, by cars which had been purposely detached from a train and allowed to follow after it. She saw the train pass, and then went along her way without looking either way along the railroad, though by looking she could have seen the loose cars. There was a man on top of them as in the present case, and he made unsuccessful efforts to warn her of danger. The court held that the question whether she was careless in failing to look up the track when at a point where it was visible, was a question for the jury to determine. Other cases, though differing some in their facts, are to the same effect, *Brown v. Railroad*, 32 N. Y. 597; *Ferguson v. Railroad*. 32 Wis. 146. These courts, it is to be observed, hold, as does this court, that, generally, a failure to look and listen when approaching a crossing is negligence and that the court should so declare as a matter of law.

3. Counsel for the plaintiff insist that this court can not review the instructions because one numbered 23 is not found in the record. It is stated in the bill of exceptions that the defendant prayed the court to give "the following instructions numbered 1 to 23 inclusive, in words and figures following." These words are followed by 22 instructions. There is then the further statement that the court gave those numbered from 16 to 23 and refused the others. After the transcript had been filed in this court, we sent it back with directions to the circuit clerk to correct the same so as to conform to such correction as should be made by the circuit court. That court heard evidence on a motion to correct the bill of exceptions, and made a finding to the effect that the bill was signed by a judge not then in office, that the "great weight of evidence" was to the effect that the defendant asked no instruction numbered 23, but that the court could not conclusively so find. The court overruled the motion, stating as a reason therefor

that it had no power to make the correction because there were no docket entries, minutes or papers from which the amendment could be made. The further transcript brought to this court, on the overruling of the motion, shows that the instructions were on file in the clerk's office, attached together in bunches, one bunch marked by the clerk "Deft's given," and another "Deft's refused," and there was no instruction 23 among them. The proof shows clearly enough that such instruction was not asked by the defendant or given by the court.

The judge hearing the motion to amend the bill of exceptions, when sitting as a court, had the power to make the amendment, and this, too though the bill had been signed by his predecessor in office. The court was also in error in holding that there was nothing of record by which to make the amendment. It is the doctrine of this court that a *nunc pro tunc* amendment of the record can only be made where there is something of record to amend by (80 Mo. 308 and 318); but the doctrine can have no application to a case like this. An inspection of the papers disclosed the fact that there was no such an instruction as 23 given, and that a mistake had been made in writing out the skeleton bill of exceptions. The claim being made that any of the instructions had been lost or mislaid, proof could be made as in case of the destruction of any other record.

We regard the finding of the circuit court, made on the motion to amend, taken in connection with the reason assigned for overruling that motion, as equivalent to a finding that no instruction 23 was asked or given, and this being so, we shall treat the record as if it had been amended to conform to such finding. To send the record back with directions to

make the amendment would be a useless ceremony. *Darrier v. Darrier*, 58 Mo. 222–233.

4. The court gave the following instruction at the request of the plaintiff:

If the defendant by its servants "cut a number of its cars loose from the rest of train, and permitted them to run at a dangerous rate of speed across the public highway, just after the rest of said train had passed where defendant's railroad crosses said public highway, without a locomotive attached to said cars, and without giving any warning sufficient to notify persons approaching and about to pass over said crossing that said cars were coming, and in such a manner as to endanger travelers along said highway, then such conduct constituted negligence on the part of said defendant railroad company. And if you further believe from the evidence that the plaintiff, Martha Baker, while passing along said highway, attemtped to cross the defendant's railroad, and, while exercising the care and caution that a prudent person under like circumstances would have done, was struck and injured by the said cars of the defendant, run and managed in the manner aforesaid, then your verdict must be for the plaintiff."

Counsel for the defendant criticize this instruction on the ground that there is no evidence that the cars were permitted to run at a "dangerous rate of speed." The expression means, and can only mean, a dangerous rate of speed under the circumstances, that is to say, on a down grade and over a public road without any engine attached. We think the objection is not well taken. The further objection is that this instruction declares the defendant negligent as a matter of law. Taking all the facts recited in the instruction in a conjunctive combination, as the instruction requires them to be taken, there can be no doubt but they constitute negligence. We see no valid objection to this instruction.

5. The chief difficulty arises out of the objection that the instructions on the subject of contributory negligence are conflicting. To an understanding of this objection we set out two instructions, besides that before mentioned:

Given by the court of its own motion: "You are further instructed that the law cast upon Martha Baker the duty, when approaching the railroad crossing, of looking and listening to discover approaching cars or trains, if any, and she was bound to so look and listen to the extent that a prudent person, situated as she then was, would, under like circumstances, have done; and if she failed so to do, the plaintiffs can not recover, unless it appears to the satisfaction of the jury, from the evidence, that her failure, if any, to so look and listen did not cause or contribute to the injury complained of, but that the accident and injury were caused wholly by negligence upon the part of the defendant as charged in the petition."

Given at the request of the defendant: "19. The court instructs the jury that a person in full possession of sight and hearing who crosses a railroad track at a road crossing with which he or she is well acquainted, without looking or listening for trains in both directions, is guilty of such contributory negligence that he or she can not recover, if injured and this is true, although the railroad company was guilty of negligence in running its train. If, therefore, you find from the evidence that at the time the plaintiff Martha Baker was injured she was well acquainted with the road crossing over defendant's track when she was hurt, and on a clear day, in open daylight, drove upon said crossing without stopping or looking in both directions for cars on said track, and was, by reason of such neglect on her part, struck by a portion of a train in charge of the conductor that was following a part of a train that had

gone east to put some cars on a switch, and that said conductor signaled the approach of said rear cars by whistling or hallooing in a voice loud enough to be heard by all persons in the vicinity of said crossing, the plaintiff can not recover, and your verdict will be for defendant. And in such case it is no excuse for plaintiff that she supposed there would be no other train or portion of a train moving on said track because she had seen the front part of said train pass east before she reach said crossing, if by looking she would have seen it in time to have avoided her injury.''

It is to be observed in the first place that the question of contributory negligence is, under the circumstances of this case, one for the jury. This follows from what has been before said. The instruction given by the court of its own motion and the one given at the request of the plaintiff proceed upon this theory. Indeed the instruction given at the request of the plaintiff excludes every other theory. Now, instruction 19 given at the request of defendant makes the contributory negligence of the plaintiff a question of law. It does not leave it to the jury to say whether the plaintiff was wanting in that care which a prudent person would have used, but it makes certain facts, if true, constitute contributory negligence as a matter of law. Besides this, the last sentence in effect eliminates from the case the conceded fact that the engine and front part of the train had just passed east—the leading circumstance in the case making the question of contributory negligence one for the jury. A careful consideration of the instructions can lead to but one conclusion and that is this, that those given by the court of its own motion and at the request of the plaintiff make contributory negligence a question for the jury, while those given at the request of the defendant make it a question of law.

The two series of instructions are in direct conflict when applied to the facts of this case.

The rule of law is well settled that to give conflicting and inconsistent instructions is reversible error. The rule has been often recognized and quite as frequently applied. *Pond v. Wyman*, 15 Mo. 181; *Wood v. Steamboat*, 19 Mo. 529; *Henschen v. O'Bannon*, 56 Mo. 289; *Stevenson v. Hancock*, 72 Mo. 612; *Price v. Railroad*, 77 Mo. 509; *Frederick v. Allgaier*, 88 Mo. 598; *Stone v. Hunt*, 94 Mo. 475.

An instruction erroneous, if taken by itself, is often helped out by others upon the same subject, but even in such cases they must not be contradictory. *Goetz v. Railroad*, 50 Mo. 472. And there are some other modifications of the general rule, but they can have no application here. The question of contributory negligence is the vital one in this case, and one as to which there is an abundance of room for a difference of opinion. It is an issue which ought to be submitted to the jury on plain, consistent instructions. It will not do to say the verdict must stand because the conflict is brought about by instructions asked by the defendant, the party now complaining. When instructions are given they are instructions of the court, no matter by whom they may have been prepared; and it is the duty of the jury to follow the instructions which are given, whether right or wrong, leaving it to the courts to correct the errors, if any, by awarding new trials.

This case is not like that of *Harrington v. Sedalia*, 98 Mo. 586, to which the attention of the writer has been called. There the inconsistency appeared in the instructions given at the request of the appellant, and it was held that the same inconsistency between some of the instructions given at the request of the appellant and those given at the request of the respondent

should not produce a reversal. Here the instructions asked by defendant are all consistent with each other. The difficulty is that, for the plaintiff the court instructed upon one theory, and for the defendant upon another and entirely inconsistent theory. The jury were left without any guide. Nor will it do to say this error is immaterial, for that is a mere speculation as to how a jury would find on correct and consistent instructions.

It is conceded and asserted that a technical error in the instructions given, which produced no injury to the substantial rights of the complaining party, furnishes no ground for reversing a judgment; but, to dispose of an erroneous instruction on that ground, it ought to appear clearly that the error did not, and could not, have prejudiced the rights of the complaining party. To use the language of *Deery v. Cray*, 5 Wall. 795, "The case must be such that the court is not called on to decide upon the preponderance of the evidence that the verdict was right, notwithstanding the error complained of." As has been said, this instruction relates to a vital issue, and there was evidence from which a jury can say the plaintiff was guilty of negligence, contributing to the injury, so that the instructions given ought to be correct and free of conflict. For the error just pointed out the judgment should be reversed, and a new trial ordered.

6. The instruction given by the court of its own motion, before set out, seems, on first view, to be incomplete, but, upon further consideration, we think there is no substantial error in it. It states, and correctly states, that the plaintiff was bound to look and listen for approaching cars to the extent that a prudent person would have done under like circumstances. This is the measure of the care which she was bound to use. The instruction then says, if she failed to use

such care, she can not recover, unless her failure to use such care did not cause or contribute to the injury. Failure on her part to use the proper care would not necessarily constitute contributory negligence. To complete the defense it must further appear that her negligence contributed to the injury. Mere negligence on her part is not sufficient. The instruction, taken as a whole, simply declares that to defeat a recovery, on the ground of contributory negligence, she must have been wanting in due care, and that want of due care must have contributed to the injury.

7. The objection of inconsistency is also made to the instructions on the subject of defendant's negligence, but they can be readily relieved of such objection, and we deem it unnecessary to say more on this point. The judgment is reversed, and the cause remanded. MACFARLANE, J., agrees with me in what I have said. BRACE, J., is of the opinion that the judgment ought not to be reversed because of the giving of instruction 19, because the giving of it was an error in favor of defendant, committed at its instance. BARCLAY, J., dissents. This case is transferred to court *in banc* for further hearing.

### IN BANC.

BLACK, C. J.—MACFARLANE, J., concurs. BRACE, J., concurs, except as to the fifth paragraph, to which he does not agree; and he and BARCLAY, J., are of the opinion the judgment should be affirmed. BURGESS, J., concurs, except as to the fourth and fifth paragraphs, and he is of the opinion there is error in the plaintiff's instruction in the fourth paragraph. SHERWOOD, J., thinks the judgment should be reversed simply, but consents to remanding the cause. GANTT, J., having been of counsel in the lower court, took no

part in the disposition of the cause in this court. The judgment is, therefore, reversed, and the cause remanded.

### STATEMENT BY SHERWOOD, J.

Action for damages for personal injuries caused the plaintiff, by being struck by the cars of defendant company, while she was driving a farm wagon and two gentle horses across the railroad track where the wagon road crosses that track, in the outskirts of the town of Rich Hill. Whether the crossing where the accident occurred was inside or outside of the corporate limits of the town does not appear; but at any rate it does appear that the scene of the accident was at the very verge of the corporate limits, if not on the outside of them.

The freight yards of the defendant company are located southeast of Rich Hill, about one mile from the town proper, and occupy a large area of land. Located there, are a water tank, section house, engine house, coal platform, otherwise coal bin, and a large number of spur or side tracks. These tracks run from west to east, and they come together into one, the main track, at the east end of these yards, which point of merger is about one hundred and fifty feet east of the point where a wagon road crosses them, running about north and south, nearly at right angles to the tracks.

Going northward on this wagon road, a traveler would first encounter and cross the two spur tracks, just where they come together; and twenty feet further north he would cross the main railroad track, at which point, as aforesaid, Mrs. Baker's wagon was struck by the cars and she received the injury complained of, which was from cars running from west to east.

At that locality, the surrounding country is prairie, and the surface of the ground for many hundred feet

south of the freight yards, is pretty much level, the center of the main track at the crossing being but five feet higher than a point in the wagon road five hundred feet south of the crossing; this is shown by the plat, and this indicates the general character of the ground south of the railroad or freight yards. It is, open country around there, there being no houses on either side of the road south of the railroad for several hundred feet. One approaching the railroad from the south, and traveling the wagon road mentioned, would have a clear view for many hundred feet of the railroad tracks and the yards west of the crossing; the only exceptions to this unobstruction being the engine house, sometimes called the round house, and the coal platform, called also the coal bin. Aside from these, the vision of a traveler proceeding northward from the south side of the railroad would encounter no erections, on the south side of the railroad track, and west of the wagon road, for as much as six hundred feet in either of those directions.

The obstruction mentioned, to wit, the coal platform, is sixty-four feet long, ten feet wide, and its east end is twenty-five feet south of the south rail of the main track. It is not parallel with the main track, as its west end is about thirty-five feet south of that track. The east end of this coal platform is one hundred feet west of the wagon road, and it is one hundred and six feet west of the crossing of the main track.

The coal platform seen in the photographs is a box two feet, four inches high set on posts; the posts are four feet, four inches above the ground, making the platform at its top six feet, eight inches high, thus allowing an opening of over four feet under the platform and above the ground, through which opening objects could be seen to a long distance, as shown by the pictures mentioned.

Over the top of the coal platform, when there was no coal on it, as was the case at the time in question, any object over six feet, eight inches in height could readily be seen, so that an ordinary box car, none of them being less than twelve feet high, some higher, would show itself several feet above the platform.

The engine house, otherwise the round house, is sixty-five feet long, twenty-five feet west of the west end of the coal platform, fifty feet south of the nearest point of the main track and over one hundred and eighty feet west at its nearest point of the wagon road. This engine house is sixty-five feet long, and so high as to shut off any view of box cars behind it, and so long that a person standing in the wagon road three hundred feet south of the crossing, would be shut off from a view of thirteen feet of that portion of the main track lying between points two hundred and ten and three hundred and forty feet west of the crossing; but, as box cars average from thirty to thirty-four feet in length, at the point designated the engine house would not shut off the view of five box cars coupled together, but would leave some thirty feet of them visible at one side or the other of the engine house. From any point in the wagon road, about three to five feet of the upper portion of a box car is plainly visible above the empty coal platform. When sitting in a wagon, the line of vision of an ordinary person is from seven feet, two inches to eight feet above the ground, and, of course, enlarges the scope of the vision of a person in a wagon over that of one on the ground.

At a point in the wagon road five hundred feet south of the crossing, a box car can be seen at any point on the main track, within two hundred feet west of the crossing, and going northward from that point, the nearer a person approaches to the crossing the further west on the main track can such car be seen.

Two hundred feet south of the crossing, he can see a car on any point on the track as far as two hundred and forty feet west of the crossing; one hundred and fifty feet south he can see the car two hundred and seventy feet west; fifty feet south he can see it about one thousand, three hundred feet over the coal platform, and looking past the east end of that platform, which, as before stated, is twenty-five feet south of the south rail of the main track, he can see a man standing on the track over two hundred feet west of the crossing.

And standing in the wagon road twenty-five feet south of the crossing, a person can look west past the east end of the coal platform, and see the main track clear through the railroad yards, a distance of over six hundred feet, and on the switches at the crossing you can see west, as Bridges, one of plaintiff's witnesses, testifies, for about a quarter of a mile.

The correctness of the foregoing statements as to distances, measurements and what could and could not be seen from the various standpoints mentioned, is abundant. Several witnesses whose testimony is preserved in the record, went on the ground and made measurements and experiments, took observations, photographs, and made a map, which map and photographs will accompany and illustrate this statement. There were no idle cars on the track at the time of the occurrence of the accident, and there were none when the photographs were taken except such as were placed on the track for photographic purposes; otherwise there was no change in scene or situation in the locality under discussion.

None of plaintiff's witnesses made measurements or experiments on the ground as did those of defendant.

With matters in this posture, about 9 o'clock on

the morning of the twenty-ninth of October, 1888, Lynch, a conductor of one of the defendant's freight trains, started with one of such trains to go from Rich Hill to Carbon Center, which it seems is a comparatively short distance east of the defendant company's railroad yards already described.

His train on that occasion, he arranged as follows: first, the engine, next, the caboose, then four coal cars, and last, five empty box cars. The coal cars were to be set in on a spur track some one thousand feet east of the crossing aforesaid. In order to set there cars in the more readily, Lynch, after he had crossed the Missouri Pacific track, and a quarter of a mile west of the crossing heretofore named, while the train was in motion, uncoupled the five box cars from the fore part of the train, which, led by the engine, ran on down to the brick yard, where the coal cars were backed in on the spur track, and the engine ran out again to the main track so as to secure and be coupled to the box cars when they should arrive. With this end in view Lynch remained on the five empty box cars.

This was the accustomed way among railroad men of attaining the purpose intended, and saved making an extra stop, and was mere *ordinary switching*, practiced in those yards of the defendant daily, and had nothing in common with what is known as a "running or flying switch."

After uncoupling the cars as previously stated, Lynch remained on the box cars, where he stationed himself at the brake of the front end of the forward car and checked their speed so that they, moving slowly, followed the first part of the train; this was to allow the precedent engine and its associate cars to have sufficient time to do its work at the brick yard. Lynch had the five cars under complete control, and they were running down grade at some five or six miles

an hour, as says Lynch, and according to Anderson, one of plaintiff's witnesses, about as fast as a common horse would trot.

As he was thus moving eastward, and when several hundred feet west of the crossing, his attention was attracted by a wagon going north on the wagon road, thereby advancing at right angles with the route he was pursuing; at that time the wagon was some two hundred and fifty feet south of the crossing, when it disappeared from view behind the engine house. Moving further eastward, when Lynch was about two hundred and fifty feet from the crossing, the wagon appeared in sight from behind the engine house, being then about one hundred and fifty feet from the crossing and Lynch then discovered that it was being driven by a woman, who seemed to be looking straight ahead, whereupon he began at once to whistle and shout at her to attract her attention, but she seemed to be looking straight ahead. The morning was a bright one; the sun was shining, and he thought she certainly would hear him or hear the cars or see them in time to check her horses before they got on the track.

Had she simply looked to her left, she could have seen him and at least a portion of the cars at any point of her approach as easily and as plainly as he saw her; this is undisputed. He kept on shouting in the endeavor to arrest her attention, but she did not even turn her head, and when he was some one hundred feet from the crossing, and fearing that she would not notice the cars he was on, the others having reached the brick yard switch, he immediately set the brakes to stop the cars; got two of them set, and the train's speed slightly slackened, before he reached the crossing, but his utmost endeavors could not stop the train, and it ran on and crossed the crossing, and in doing so struck the wagon about the middle, overturned it and

threw out its occupant, who proved to be the plaintiff, Mrs. Baker. The cars, after striking the wagon, ran on some seven or eight car lengths, when they stopped without further application of the brakes.

That morning the injured plaintiff had left home four and a half miles from town, about 8 o'clock, to go to Rich Hill, and was driving two gentle horses, hitched to a farm wagon, loaded with fish, with a hood over her head and ears. The morning was bright and clear, and she quite familiar with the crossing; had been over it many times, and knew how it was built.

She arrived in the neighborhood of the crossing with her team in a "good walk." When she reached a point from eighty to one hundred and twenty-five feet, as she says, of the track, she saw the engine and cars pass down to the east. She says she did not hear anything, or see anything coming to the left of her; heard nothing but the train that had passed, and then started to drive across the track, and, after that, knew nothing more until she found herself in bed in a neighboring house.

Besides the conductor, there were four other eyewitnesses of the collision. They were Anderson, a witness for plaintiff, and Horn, Scott and Clayton, witnesses for defendant.

Anderson on his return home from the brick yard where he was working, and carrying a bucket of water, when some sixty to one hundred feet in a northeasterly direction from the crossing, had his attention attracted by the hallooing of Lynch and looked that way. The five box cars were then about the corner of the engine house, and Mrs. Baker was quite a piece down the road from the crossing, but coming towards it. Anderson says that Lynch kept up this hallooing till just on the eve of getting off the car when about the center of the coal bin or platform. He says Mrs. Baker paid no

attention to the hallooing; never looked to right or left but drove straight on; that he thinks he saw her give the lines a kind of jerk, as she was pretty near over the track.

Horn four or five hundred feet away from the crossing in a northwesterly direction, working a windlass at a little coal shaft; Scott some one hundred feet south of the track and three hundred feet east of the crossing, walking away from it and with his back to it, and Clayton, street commissioner, working in a street one hundred and sixty to one hundred and ninety feet northwest from the crossing, with his back to the track and driving some stakes, all heard the shouting of Lynch, the conductor, and, looking that way, saw plaintiff in the wagon and Lynch on the cars, and watched them both till the collision occurred.

Some of these witnesses speak of Lynch's making motions as well as shouting. Horn says plaintiff was looking eastward all the time; he supposed she was watching the engine and cars that had passed on down east. Clayton says that if plaintiff was looking any way but straight ahead she was looking out east. He was asked if he saw her look to the west, and, answering, said:

"*Not till the cars were almost to her; when they were within a few feet of her she threw her head around and slapped her horses with the lines.*"

All of these witnesses agree that plaintiff did not stop her team or pay any attention to the shouting or look any way but either straight ahead or else to the eastward. Scott is the only exception to this, but to the extent that he did not observe which way plaintiff looked.

Lynch corroborates Clayton on a point already mentioned, for, when the former was asked this question: "Did she look around toward you?" he replied: "Just before she got on the crossing, she looked around

and saw the cars, and commenced to slap the horses with the lines.'' Anderson's testimony, as will be remembered, so far as it goes, also corroborates that of Lynch and Clayton on this point. Lynch is also supported by other witnesses about his having set the brakes, and more strongly by the physical fact that the cars on a down grade stopped after having gone only some two hundred and ten to two hundred and thirty feet beyond the crossing when they stopped. There is no evidence in the record as to the distance in which the cars could have been stopped.

Recurring to the testimony of plaintiff, she explicitly testified, that *she did not see the cars* that struck her wagon. *Nor would she testify that she looked in their direction at all before driving on the track.*

Here are some *excerpta* that have been taken from her testimony, which present the substance of her testimony on these points fully and fairly:

''*Q. Did you look up the track? A. Well, I don't say for sure that I looked, but I always do look, and I think I must have looked that time; if I failed to look that time it was the first time.*''

''*Q.* Well, give the jury the best of your knowledge about that. *A.* Well, I always look before I drive on the track, and if I failed to look that time it was the first, *but to the best of* my knowledge I looked each way.''

''*Q.* Did you listen? *A.* Of course I listened.

''*Q.* Did you see or hear anything coming to the left of you? *A.* No; sir; nothing but the train that had passed.

''*Q.* After you stopped and had listened, as you think, what did you do? *A.* I started to drive across.

''*Q.* Then what happened? *A.* I can't tell anything more what happened; that was the last I knew until I was in Mr. Anderson's house on the bed.

"*Q.* Did you look up the track to the west at all that morning? *A.* I think I did, I never fail to look up and down before I cross a railroad; if I didn't look it was the first time.

"*Q.* If you did look, how far was you from the track? *A.* I was so I could see.

"*Q.* Could you see for two or three hundred yards? *A. Yes, and further.*

"*Q.* After you looked did you see that you could not see a car twenty or thirty feet long? *A.* No sir; I could not see any cars, but they run on me before I could cross the track.

"*Q.* How far was you from the track; was you back as far as twenty or thirty feet from the track when you looked east? *A.* Well, I looked up and down.

"*Q.* Did you say in your former examination that you didn't remember looking west? *A.* I said to the best of my knowledge that I looked up and down, that is what I remember about it.

"*Q.* Did you say that you was in the habit of looking, but you couldn't say whether you looked that day or not? *A.* I don't say pint blank, but to the best of my knowledge I looked.

"*Q.* If you did look did you see anything? *A. Of course I didn't. I would not have driven on if I had.*

"*Q.* If you did look, how far was you from the track when you did look? *A. I can't say.*

"*Q.* Did you look before you got on the track or check your horses up? *A.* That is all I have to say; that is the best I can remember about it, I have stated to you exactly as near as I can, and I think that will do."

In her deposition taken on behalf of defendant in April, 1889, plaintiff testified:

"*Q*. As you approached the track you saw the engine and cars down toward the brick yard to your right hand, did you? *A*. Yes, sir.

"*Q*. Did you see any cars on the railroad track at your left hand? *A*. No, sir.

"*Q*. While you were driving up to the crossing or while you were on it? *A*. No sir, I didn't.

"*Q*. Were there any cars on the track at your left hand as you approached the crossing? *A*. I would not tell you whether there was or not. I did not see any.

"*Q*. Did you look to see whether there were any there or not? *A*. Well, I never drove over a railroad track in my life without looking; and I don't think I did that time.

"*Q*. Are you sure that you looked up to the left hand to see if there were any cars before crossing? *A*. *Well, seeing them cars pass on, I would not say for sure that I looked, for I thought, of course, they had passed on.*"

Under the instructions for the court, the jury returned a verdict for plaintiff in the sum of $7,500 and defendant appeals.

Other facts and matters, where material, will be adverted to hereafter.

### OPINION.

SHERWOOD, J.—It has been deemed best to state, as heretofore, the controlling facts in this case at considerable length, because of the belief that they are quite important factors in any investigation required, and because also, the previous opinions herein delivered, do not, as it seems to me, set forth those facts with sufficient fullness to meet the exigencies of the occasion.

The questions naturally incident to, and arising on, the facts already stated are these:

*First.* Was the defendant guilty of negligence as charged in the petition?

*Second.* Conceding such negligence, was plaintiff guilty of such contributory negligence, but for which she would not have been injured?

1. Intimately associated with the charge of defendant's being negligent, is the question whether defendant employed a "*flying or running switch,*" at the time and place of the accident. Lynch, it will be remembered, testifies that it was not a flying or running switch he made; that he simply cut the train in two, in the ordinary way; sent on the engine, the coal cars and the caboose, with directions to set in the coal cars on the switch at the brick yard, and, the engine and the caboose, being on the main track, having never left it, were to be there rejoined by the five empty box cars, of which Lynch remained in charge, and which had never left the main track.

On the point as to whether a flying switch was made by him, Lynch was asked, and answered as follows:

"*Q.* That is not a flying switch? *A.* No sir. If I wanted to make a flying switch, the switch would have to be on the west end, and the engine would run over the switch and the switch thrown to the side track

and the engine would go on and the cars would go in on the side track."

Lynch's testimony as to there being no such switch as that mentioned, is also abundantly sustained by authoritative definitions. Thus, "a flying switch is made by uncoupling the cars from the engine while in motion, and throwing the cars out to the side track after the engine has passed it on the main track. 29 Iowa, 14.

"To make a 'running switch' a train approaches with considerable speed, and, while so approaching, the car to be left is disconnected; the forward part of the train then passes rapidly over the switch, the rear part is somewhat checked, and the intermediate car to be left is switched off, and the switch is replaced in season for the rear part of the train to unite with the front part thereof, without stopping." Note to *Brown v. Railroad*, 32 N. Y. 597; 8 Am. and Eng. Encyclopedia of Law, 73, and other cases there cited.

A very good definition is also found in Century Dictionary: "Flying switch—a switch operated or effected in such a way, while a train is in motion, as to send different parts of the train (previously connected) along different lines."

A "flying switch" and "running switch" are identical in meaning, and may be created in the way mentioned; "or the locomotive, without being coupled, may back up to a car, or to a portion of a train, with considerable speed, and, giving it a parting kick, send it off in a desired direction." 21 Am. and Eng. Encyclopedia of Law, 439, 440; 4 *Ibid.*, 936.

So that it readily appears in the case at bar that there was *no flying or running switch made*, and, therefore, the rules applicable to such switches do not apply here. But, should it be conceded for the nonce that such separation of the cars in a train, while it is in

No. 1.—Taken from a point on line of wagon road 255 feet south of the crossing .

No. 2.—Taken from a point 224 feet south and west of the crossing.

No. 3.—Taken from a point 51 feet south and 71 feet east of the crossing.

No. 4.—Taken from a point in center of wagon road 500 feet south of the crossing.

No. 5.—Taken from a point in wagon road 100 feet south of the crossing.

Map showing part of Depot Yard at
RICH HILL, BATES Co., Mo.
Showing Location of Traveled Road
That crosses Depot Yard
East of Section House
Scale 50=1

motion, constitutes a "flying switch," still the authorities which condemn such switches, do not apply in the present instance, and this for several reasons: *First.* The locality at which the separation of these cars occurred, inclusive of the crossing, was not in a thronged center of population; for, as already related, the *locus in quo* was "about a mile" from the town of Rich Hill; *second,* the box cars were empty; the time was daylight, and the sun shining; the grade was light, only a four inch fall in every one hundred feet, and there was the *conductor stationed at the brakes on the front car,* and the brakes were amply sufficient for controlling the cars in any ordinary emergency, as shown by the result. In such circumstances as these, the doctrine respecting flying or running switches does not apply, even if such switches are employed. This is obvious from the cases cited in the second deliverance herein.

Thus, in *Ferguson v. Railroad,* 63 Wis. 145, the injury occurrred at a street crossing on the main business street of a populous village, and, enunciating the dominant principle of such cases, Lyon, J., quotes with approval this passage from an earlier decision, where Dixon, C. J., said: "If trains are to be divided in this way, and run by sections across the streets of populous towns and villages, the least that can be required of the company is that there should be *some suitable person at the forward end of the foremost* car to notify and warn people passing along the street, and likewise a *man at the brakes,* that he may set them, in order to avoid collision."

So, too, in *O'Connor v. Railroad,* 94 Mo. 150, a similar enunciation is made, where one of the syllabi gives as a correct and condensed utterance of the views of this court, the following: "It is negligence for a railroad company to make a flying switch on a public

highway which is in constant use, without the car being attended by, and under the control of, a brake-man.'' In that case the car was "kicked" a single car westward, and across a public and thronged street and crossing, and into the switch yard, and there was no brakeman or other person on the car thus kicked.

In *Railroad v. Converse*, 139 U. S. 469, the running switch was made at *night;* the crossing was at the county road; the engine, with twelve cars, was separated from the other twelve freight cars and a caboose; these cars were only some ninety feet behind the other section when the crossing was reached; there was *no brakeman* on the front end of the first car of the rear section; the cars had a momentum of ten miles an hour; there were neither gates, lights nor flagman at the crossing; there was no light on the front car of the rear section when it reached the crossing; the only light on the cars of that section at that time was in the caboose, as, just before reaching the crossing, a lantern which a brakeman had on the rear end of the platform on the first car of the rear section, a platform only two feet below the roof of the car, was extinguished by the wind; and there were only ordinary brakes on the cars, and it was properly ruled in that case that plaintiff was guilty of no negligence in attempting in such circumstances to cross the track, and that the defendant company was guilty of negligence as a matter or law.

On comparison, similar divergencies will be found to subsist between the other cases cited and the one at bar; and the case of *French v. Railroad*, 116 Mass. 537, is governed by a peculiar statute (Acts, 1871, p. 699), by which, if signals were not given at a public crossing, a recovery could be had by a party injured by collision with a train, unless it is shown in addition to a mere want of ordinary care, that the person

injured was, at the time of the collision, guilty of
*gross* or *willful* negligence, etc.  For these and other
reasons which will easily suggest themselves, on reading
these cases there is no substantial similarity between
them and the one in hand.  All the circumstances of
this case broadly distinguish it from those heretofore
cited, and show it to be exempt from rules which fre-
quently should govern cases of the former sort.

And in this connection, it may not be amiss to
mention two other crossing cases where flying switches
were used.  Thus, in *Magner v. Truesdale*, 55 N. W.
Rep. 607, a "flying switch" was made at a street
crossing, and, the engine being detached, had run ahead
and passed the deceased, who had his back to the
shunted car, which struck him.  It does not appear
that there was a brakeman on the car thus "kicked,"
and it was there said by the supreme court of Minne-
sota:  "The fact is indisputable, on the evidence, that,
had he looked back before he stepped on or so near the
track, he must have seen the approaching car in time
to avoid it.  One or two of plaintiff's witnesses indicate
that there was some fog, and that the engine threw some
smoke down upon the track; but, even those witnesses
testify that they saw, not only the car, but the man,
when they must have been at a considerable distance.
There is no evidence that he made any effort to learn if
there was danger.  The only evidence on the point was
that he was walking along with his head down, appar-
ently paying no attention to anything.  He had lived in
the city about five months; was a railroad man; * * *
and he must be presumed to have known the situation
and danger of the Elm street crossing.  The rule being
that one approaching, and about to cross at, a railroad
crossing, must use his senses, his sight and hearing,
unless he is in some way, through no fault of his, pre-
vented to learn if he can make the crossing safely,

and that it is negligence *per se* to place himself upon the track without looking and listening, when he can look or listen, and doing so would inform him of the approaching danger in time to avert it, the deceased was clearly guilty of such contributory negligence as must prevent a recovery. A verdict for the plaintiff could not have been sustained, and defendant was entitled to a direction to return a verdict for him."

*Graf v. Railroad*, 54 N. W. Rep. 388 is another "flying switch" case, where the cars were "shunted" or "kicked" across a public street, and deceased was struck by the cars thus shunted, and killed. There were several tracks and decedent was familiar with the situation, having crossed the tracks daily for about two months. It was broad daylight and the sun shining at his back. His view of the tracks to the south was somewhat obstructed by the lumber piled along and near the defendant's right of way; but as he reached the right of way he had clear and unobstructed view for one thousand feet to the south. There is evidence that as he reached that point he looked to the south, but did not stop or slacken his speed, and *was not seen to look again* before he was struck. At this point he was only thirty feet from the middle track. No other cars were on the track, and there was nothing there to obstruct his view of the approaching train. A disinterested witness stood in the office of the city lumber yard, on the north side of the street, saw him walk across, saw the train crossing, and testified that he never thought deceased would cross in his position. All the witnesses who testified to the accident say they saw the train approaching, heard the noise made by the puffs of the engine and cars, and that the cars were shunted back in the "usual manner." There was no evidence of any reckless speed and there was *a brakeman on the cars* upon the platform between the second and third cars;

but it does not appear that he saw deceased. Two witnesses also testify that they saw a man running along the tops of the cars as they were advancing. Upon these facts the lower court directed a verdict for defendant, and, in commenting on this direction, the supreme court of Michigan said: "Had the brakeman seen the deceased as he was approaching, he certainly had the right to presume that he would stop. He might have stopped with perfect safety when within three or four feet of the track. No obligation rested upon the brakeman to attempt to stop the cars until he saw that the deceased intended to step in front of them, regardless of the danger. It would then have been impossible for him to have stopped the train in time to avoid the accident. We think the direction of the circuit judge is clearly within the following authorities: *Grostick v. Railroad*, 90 Mich. 594; *Apsey v. Railroad*, 83 Mich. 439; *Mynning v. Railroad*, 64 Mich. 93; *Freeman v. Railroad*, 74 Mich. 86; *French v. Railroad*, 89 Mich. 537; *Pzolla v. Railroad*, 54 Mich. 273; *Kwiotkowski v. Railroad*, 70 Mich. 549. Many other authorities might be cited, but we deem it unnecessary. To hold that the plaintiff might recover under the undisputed facts of this case would be to reverse the previous decisions of this court. The deceased walked for thirty feet in plain view of the approaching train, which could be seen by him at a glance. If the negligence of the defendant was gross and reckless, the negligence of the deceased was equally so."

It is obvious, therefore, in these cases just cited, that, even in the case of "*flying switches*," the doctrine of contributory negligence has its appropriate place, and its ultimate bearing and consequently can not be ignored.

Having thus reached and disposed of the question of flying or running switches, and having endeavored

to show that, even if a running switch had been used in the present case, that its circumstances would not warrant the application of the rule in regard to such switches, it is proper to proceed to discuss the questions before suggested, questions which lie at the heart of this cause.

2. The rule so often iterated and reiterated by this court in regard to railroad crossings and the duty of travelers when approaching the same, is again invoked at the present time. Touching this duty, an author of conceded merit says: "When one approaches a point upon the highway where a railway track is crossed upon the same level, it is his plain duty to proceed with caution; and if he attempts to cross the track, either on foot or in a vehicle of any description, he must exercise, in so doing what the law regards ordinary care under the circumstances. He must assume that there is danger, and act with ordinary prudence and circumspection upon that assumption. The requirements of the law, moreover, proceed beyond the featureless generality that one must do his duty in this respect, or must exercise ordinary care under the circumstances. The law defines precisely what the term 'ordinary care under the circumstances' shall mean in these cases. In the progress of the law in this behalf, the question of care at railway crossings as affecting the traveler, is no longer, as a rule, a question for the jury. The *quantum* of care is exactly prescribed as matter of law.

"In attempting to cross, the traveler must listen for signals, notice signs put up as warnings, and look attentively up and down the track. A multitude of decisions of all the courts enforce this reasonable rule. It is also so consonant with right reason and the dictates of ordinary prudence, and so much in line with the ordinary care which the average of mankind dis-

play in the daily routine of life, that it should seem to be scarcely dependent upon the authority of decided cases in the law courts." Beach on Contrib. Neg. [2 Ed.], secs. 180, 181.

In many cases in this court, parties injured, or their representatives, have been denied a recovery because of failing to observe the precautions mentioned in the sections just quoted. *Harlan v. Railroad*, 64 Mo. 480; *Fletcher v. Railroad*, 64 Mo. 484; *Harlan v. Railroad*, 65 Mo. 22; *Henze v. Railroad*, 71 Mo. 636; *Purl v. Railroad*, 72 Mo. 168; *Turner v. Railroad*, 74 Mo. 602; *Hixson v. Railroad*, 80 Mo. 335; *Fox v. Railroad*, 85 Mo. 679; *Kelly v. Railroad*, 88 Mo. 534.

The foregoing cases, with perhaps one exception, were those where the parties injured were riding in vehicles, and in all of them recoveries were peremptorily denied because of contributory negligence of the parties injured, and this on demurrers to the evidence.

Thus in *Henze's case*, it is said in substance: "A traveler approaching a railroad track is bound to use his eyes and ears, so far as there is an opportunity, and where, by the use of these organs, danger may be avoided, notwithstanding the neglect of the railroad company's servants to give the signals, the omission of the plaintiff to use his senses to avoid the danger is concurring negligence entitling defendant to a nonsuit."

In *Turner's case* this court said: "Defendant's servants were, beyond question, guilty of negligence, if they did not ring the bell or blow the whistle, as required by the statute when a train approaches a public crossing; but it is also negligence, gross negligence, for one traveling in a wagon to attempt to drive over a railroad without using ordinary precautions to ascertain if a train is approaching. He directly con-

tributes to his own injury, who, paying no attention to his own safety, trusts to the obligations imposed upon the company to warn him of an approaching train."

In *Stepp v. Railroad*, 85 Mo. 229, the decedent with a loaded wagon, attempted to drive over a railroad crossing on a still moonlight night, and was killed by a passing train, and in reference to this, this language, among other, is used: "It has been repeatedly held by this court that it is the duty of one crossing a railroad track to look and listen for an approaching train, and thus get all the information his eyes and ears will afford him, and if he fails to do this and thereby contributes to the injury, he must suffer the consequences, even though the company may have been derelict in the performance of its duty in giving the signals. *Fletcher v. Railroad*, 64 Mo. 484; *Harlan v. Railroad*, 64 Mo. 480; *Purl v. Railroad*, 72 Mo. 168.

"If the crossing is obstructed from view, increased caution is required on the part of the traveler as well as the company; and if, from noise, such as a gale of wind or the rattling of a wagon, hearing is rendered difficult, then it would become the duty of the traveler to stop and listen."

In *Kelly v. Railroad*, 88 Mo. 534, the collision occurred at the crossing of a street in Kansas City, and recovery was denied *because the train might have been discovered, although signals were not given and an ordinance as to speed was violated, and in spite of the fact that the plaintiff stopped his team to let a switch-engine pass, which obstructed his view of the train that struck and killed his team.*

In *Yancey's case*, 93 Mo. 433, a "flying switch" was made by an engine shunting or kicking a single car across a public street crossing in the city of Hannibal. The car thus shunted had a brakeman on top of it, but it was going ten miles an hour, when by ordinance

the speed of trains was fixed at six miles an hour. No bell, of course, was rung or other signal given. Yancey started across the track about sixty feet in front of the moving car, with an umbrella over his head and busily engaged in talking with his companion, and never stopped, looked or listened for the approaching car, although called to by several bystanders before he stepped upon the track, and it was held that, as he could have seen the car had he looked, his negligence was the immediate and proximate cause of his death, and, further, that the brakeman had the right to presume, if he saw deceased approaching the track, that he would not recklessly put himself in front of the car.

In *Butts v. Railroad*, 98 Mo. 272, a woman with an ordinary sunbonnet on, which covered her face and ears, attempted to cross the tracks of a railroad in the town of DeSoto, at a public crossing, which there ran north and south. Several hundred yards south of that point the engine of a freight train had been cut off therefrom, the engine run in ahead on another track in advance of the detached cars, while they, moving by their own momentum, followed on after the engine, which passed the crossing backing northwards, just as Mrs. Butts attempted to cross; it seems it attracted her attention, because she followed it with her eyes. The view of the detached and approaching cars was largely cut off from Mrs. Butts by cars standing on other tracks and reaching up to the crossing, and the tracks being smooth they made less noise than freight trains usually do. She could have seen the cars by turning her head to the south, before going on the track they were on, though she could not have seen them until within seven and one-half feet of that track; but, with her eyes riveted on the backing engine which had just passed north, she failed to look to her left, or the south, and

was struck and killed by the obtruncated train; and it was ruled that, inasmuch as she had the opportunity to see the train, and failed to look, her negligence contributed to her death and barred recovery.

In *Boyd v. Railroad*, 105 Mo. 371, where decedent was killed in the town of Renick on a public crossing by an excursion train running at the rate of forty to forty-five miles an hour, a train that he could have seen and distinguished from the ordinary slow moving mail train that he was expecting, had he looked carefully, and, because he did not do so, BRACE, J., speaking for the court, in substance said: "That it was the duty of deceased to look and listen, if he could see or hear the train, for the purpose of avoiding injury by it; and if at any time he might have stopped his progress and avoided injury, then he was guilty of contributory negligence." And it was also ruled in that case that if the servants of defendant in charge of the train, saw deceased approaching the track, they had the right to presume that he would not attempt to cross immediately in front of the train, and had the right to proceed without abating its speed.

In *Harlan v. Railroad*, 64 Mo. 480, this court said: "A person who goes on a railroad track, or purposes to cross it, must use his eyes and ears to avoid injury. A neglect of regulations in regard to bell ringing may amount to negligence in law, on the part of the railroad employees, but that does not absolve strangers who propose to cross the track, from ordinary care. Indeed, every intelligent person who has arrived at years of discretion is presumed to know that it is dangerous to be on a railroad track when trains are passing to and fro, and when crossing one he is expected to be vigilant and watchful of the approach of a locomotive. *The failure to exercise such vigilance is negligence per se.*"

In Michigan, an instruction in this form has met with frequent approval: "The track itself is a warning of danger to those who go upon it, and persons about to cross a railroad track are bound to recognize the danger, and to make use of the sense of hearing as well as of sight, and, if either can not be rendered available, the obligation to use the other is the stronger to ascertain, before attempting to cross it, whether a train is in dangerous proximity; and if they neglect to do this, but venture blindly or carelessly upon the track, without any effort to ascertain whether a train is approaching, it must be at their own risk. Such conduct is of itself negligence." *Mynning v. Railroad*, 59 Mich. 257, and cases cited.

In the quite recent case of *Rodrian v. Railroad*, 125 N. Y. 527, the facts and the rulings upon them were as follows: "In an action to recover damages for the alleged negligent killing of R., plaintiff's intestate, at a highway crossing on defendant's road, it appeared that R. was familiar with the crossing. She approached it with a small shawl tied or pinned over her head and ears. There was no evidence that she looked up or down the track before attempting to cross, or that she stopped or listened; the only evidence being that she appeared to be looking directly in front of her. The track on which the train came, by which she was killed, was free to observation for at least seven hundred feet from a point eight feet from the track where R. was injured, and from thence to the track. *Held*, that, although R.'s attention may have been distracted by a freight train going in an opposite direction, or by a ditch across the highway two feet from the tracks, she was not justified in proceeding without looking both ways for approaching trains."

In *Allen v. Railroad*, 19 Atl. Rep. 105, the supreme

court of Maine says: "The evidence shows that, at twen-
ty-five or thirty feet distant from the crossing, the ap-
proaching train from Bath might have been seen by the
plaintiff several hundred feet distant from the crossing.
The plaintiff did not look in that direction until his
horse's fore feet were between the rails. Was the neglect
on his part to look in that direction a want of ordinary
care and prudence? Is a traveler justified in driving
upon a rairoad crossing, in the absence of safety sig-
nals giving him the right to cross, without looking for
an approaching train? It has been many times decided
in this state that the traveler, before crossing a railroad,
must both look and listen. * * * If the crossing
at which the plaintiff was injured is so constructed that
an approaching train can not be seen until a traveler
comes very near to the railroad track, common pru-
dence requires him to approach at such speed that,
when an aproaching train may be seen, he may be able
to stop, and allow such train to pass."

In a crossing accident case in Indiana, it is said by
the supreme court of that state: "The third instruc-
tion would have informed the jury, had it been given,
that a railroad track is of itself a warning to those who
go upon it, and that persons about to cross it are bound
to recognize the danger, and to make use of the sense of
hearing as well as that of sight; and if either can not be
made available, the obligation to use the other is the
stronger; to ascertain before attempting to make the
crossing whether or not a train is in dangerous prox-
imity; and if one neglects to do this, but carelessly
ventures upon the track, and is injured, it must be at
his own risk; that such conduct is sufficient of itself to
defeat a recovery. This instruction stated the law cor-
rectly. All persons who are acquainted with the
manner in which railroad companies operate their trains
over their lines of railroad know that there is always

more or less danger in going along or across a railroad track; that there is always danger from a passing train; and that safety requires that both the sense of sight and hearing must be exercised vigilantly to ascertain if a train is approaching; and hence a failure so to do would constitute negligence. This, we think, is self-evident. And if the circumstances are such that but one of the senses can be exercised, it is evident to any one that the sense which can be exercised should be employed with still greater vigilance. * * * If a crossing is particularly dangerous, and requires extraordinary effort to ascertain whether it is safe to attempt to pass over it, one familiar with the locality and danger surrounding it must use care proportioned to the probable danger. This instruction unquestionably stated the law correctly. The greater the danger, the greater must be the care exercised. * * * The question of contributory negligence did not depend upon what the appellant's employees did, or did not do, but upon what the appellee's servant did, in the light of the *res gestæ*. We are at a loss to understand what difference it could make, as to the caution to be used by the appellee's servant, whether there was or was not a statute requiring the giving of signals. It was his duty to stop and look for an approaching train, if there was any point within a reasonable distance from the crossing from which he could observe a train approaching; and, if no train was to be seen, it was his duty when nearing the crossing to stop and listen for the sound which ordinarily follows a moving train; and a statute requiring signals to be given, though violated, does not excuse this vigilance." *Railroad v. Stommel,* 25 N. E. Rep. 863.

A person familiar with a crossing, was struck by a snow plow and injured. No signals were given. He was familiar with the locality. After he came within

view of the enclosing fence, his view of the track was so far obstructed that he could not see the approaching engine, and when he came nearer to the track, his road lay between two piles of railroad ties, so high as to obstruct his view, both piles being about six feet from the railroad track; but when that point was reached, his line of vision in both directions was wholly unobstructed, and by looking he could have seen an approaching train as far away as the snow in the air enabled him to see, say thirty-five or forty rods. On these facts the supreme court of Minnesota affirmed the judgment dismissing the action, remarking: "Such being the case, common prudence required him to look, as he could have done by simply turning his head, slackening his pace if necessary to enable him to do so. The testimony suggests no reason or excuse for not looking, and it must be deemed the plaintiff's own fault that he did not do so in time to avoid the injury. His testimony is that, having previously looked and listened, as he came out from between the two piles of ties, he looked first to the south, then to the north, just as the snow plow struck him. In brief, it is shown that, without any necessity or special reason for doing so, the plaintiff walked on the track, or so near to it as to be struck by moving trains, without first looking to see if a train was within dangerous proximity. This was negligence." *Clark v. Railroad,* 50 N. W. Rep. 365.

So in *McCrory v. Railroad,* 31 Fed. Rep. 531, where the plaintiff's view of the passenger train that struck him was cut off by smoke from a freight train which had just passed, the judge says the plaintiff "must have known that there were two tracks, and that a train was liable to come on each track; and if, when approaching a track, he finds anything which temporarily obstructs his vision, it is his duty to wait

until the temporary obstruction is removed. He can not say, 'There is something temporarily obstructing my vision, but I will take it for granted that there is' no danger,' and undertake to cross the track.  *  *  * The law lays it down clearly that a man must look and listen. And if by looking and listening, he could ascertain the approach of a train, and fails to do so, he is guilty of contributory negligence, and can not recover.''

*Gardner v. Railroad*, 56 N. W. Rep. 603, is another accident-at-crossing case. The plaintiff was injured while crossing the main track of a railroad in a public street in the city of Ionia. His testimony tended to show that he observed due care; that there was no bell rung or whistle sounded; that, as he proceeded south, freight cars standing on a switch track entirely obstructed his view, and his attention was diverted by a switch engine on the other side of the street ringing its bell and blowing off steam. He also testified that as he stepped out from behind these freight cars his hat blew off; when he took one more step, he could see east down the main track, and looking he saw no train; that at this juncture his attention was diverted by the switch engine as aforesaid, that he was not familiar with any of the tracks, but knew there were several tracks there; that before getting to the main track he looked to see whether there was a train coming, and saw this switch engine playing backward and forward and making considerable noise; but knew nothing of any train coming, and was struck upon the first track he came to, and just as his foot was over the south rail. Upon this evidence, defendant's counsel asked an instruction that plaintiff's own testimony showed him guilty of contributory negligence. This was refused. Thereupon defendant's counsel asked the submission of certain special questions to the jury, among them: ''(2) Was not the southwest corner of the box car nearest depot

street at least five feet from the north rail of defend-
ant's main track? (3) Could not Gardner at any
point on the walk, when he was walking between the
north rail of the defendant's main track and a point five
feet north of said rail, if he had looked to the east, have
seen east on the main track for at least a distance of
two hundred and fifty feet? (4) Did Gardner look
east after he got to a point where he had an unob-
structed view of the main track?" Submitted, each
or these questions was answered in the *affirmative,*
and the jury rendered a verdict for plaintiff for
$4,400. Thereupon defendant's counsel moved for
judgment for defendant, which motion was denied.
On these premises the supreme court of Michigan
remarked: "We think the court below should have
entered judgment for defendant upon the plaintiff's own
testimony and the finding of the jury. It was found that
when the plaintiff was within five feet of the north rail he
could, if he had looked, have seen eastward on the
track a distance of two hundred and fifty feet. There was
nothing to obstruct his view, if he had looked. The court
let the case go to the jury on the ground that the plain-
tiff's attention was diverted from the seat by the switch
engine, and therefore he might be excusable for not
looking. It is apparant from plaintiff's own testimony
that he was not exercising due care in going over these
tracks. A railroad track is in itself notice and warning
of danger, and we have repeatedly held that it is the
duty of a person approaching a crossing to look and lis-
ten before venturing upon it.    *    *    *    In the case of
*Kwiotkowski v. Railroad,* 70 Mich. 551, Mr. Justice
MORSE, speaking for the court, said of plaintiff's intes-
tate: 'We can not avoid the conclusion that the
deceased did not look up or down the track, as he
should have done, after passing the wood office. If he
had so looked, he certainly must have noticed the head-

light of the approaching train. If he did not look, he must have been careless, and attempted to cross the track when he should not have done so.' In that case it was shown that a person, after passing the office, could look up or down the track about a block, and yet the deceased passed upon the track and was struck by the train and killed. The court below directed a verdict for the defendant, and it was affirmed in this court. This case is similar in principle. It was broad daylight, and, when within five feet of the north rail of the track, it is undisputed that the defendant could see two hundred and fifty feet east along the main track. No one disputes that, if he had but looked, he certainly would have seen the train. It is evident, therefore, that he did not look; or, if he did, he saw the train and carelessly attempted to cross in front of it, and in either case he was guilty of such negligence at to preclude a recovery. * * * If he had looked eastward, he would have seen the train before he stepped upon the track. The ringing of the bell and the blowing off of steam from the switch engine did not relieve him from the duty of looking in the other direction. One look eastward, and one less step taken, he would not have been upon the track. Upon any theory of the case, it was the duty of the court to have directed the verdict in favor of the defendant."

In *Schmolze v. Railroad*, 53 N. W. Rep. 743, the plaintiff was struck by a locomotive at the Hamlet of Harshaw, consisting of a steam sawmill, store, hotel and a few dwelling houses. The railroad runs there nearly north and south. The accident occurred in the daytime, and the locomotive had been detached from a freight train at a point some thirty rods north of the place of injury, in order to go on to a spur track and take out some empty cars standing thereon, and the locomotive passed on towards the switch. At about

1:30 P. M. of that day he started to go to the store on an errand. He passed out at the southwest corner, and walked along the south end of the mill until he reached the southeast corner thereof. When one or two steps past that corner he looked up and down the railroad track, but saw no train. His range of vision on the track from that point to the north was about four hundred feet. He continued to walk in a southeasterly direction, going about forty or fifty feet before he reached the track. He stepped between the rails, and had walked between them diagonally, to the southeast, probably sixteen or twenty feet, when he heard an alarm signal, and was immediately struck by a locomotive engine running south on the track, and received the injuries complained of. He was walking slowly, with his head down, and did not stop, and did not look either way along the track for trains. The trial court refused to direct a verdict for defendant, and to set aside a verdict for plaintiff.

LYON, J., who delivered the opinion in *Ferguson v. Railroad*, 63 Wis. 145, *supra*, also delivered the opinion in the case under comment. In the course of his remarks, among other things he said: "We can not uphold the judgment of the circuit court from which this appeal is taken. The testimony of the plaintiff proves conclusively that he was guilty of negligence which contributed directly to the injury of which he complains. The sawmill was running when plaintiff started for the store, and continued to run until he was injured. The noise made by it interfered, or was liable to interfere, with his hearing an approaching train. This fact increased his obligation to make use of his eyes when he went upon the track, and, while on it, to ascertain if a train was approaching him. * * * A glance to the north up the track, as he approached it, or during most of the time he was

walking between the rails, would undoubtedly have disclosed to him the presence of the approaching locomotive, and enabled him to escape injury. Several persons at the sawmill, and others on the platform at the store, saw the locomotive approaching the plaintiff in time for him to have easily got out of the way of it had he also then discovered it; and those upon the platform tried to warn him of his peril, but without success." In concluding his opinion the learned chief justice refers in terms of approval to *Myers v. Railroad*, cited *infra*.

I have made these lengthy quotations from the authorities replete with illustrations of the doctrine of contributory negligence in application to stated facts, as showing the *status* of the current law on this subject. Of course, there are occasional aberrations from the true course of adjudication on this point, where *the judicial vision seems as incapable of discerning the most pronounced palpable contributory negligence, as is the victim of that fault to see the ponderous advancing train by which he is struck!* Nevertheless, it still remains the duty of courts to apply the *correct rule*, regardless of the fact that *judicial vagaries* may sometimes be indulged in at variance with the authorities heretofore cited.

Now, applying the correct principles as announced in the foregoing authorities to the facts here presented, how stands the plaintiff's case? It must be observed that here no question can arise as to the rate of speed of the five box cars being unlawful, because the scene of the accident does not appear to have been within corporate limits, and, unless this is so, no rate of speed is negligent *per se*. *Wallace v. Railroad*, 74 Mo. 594; *Bell v. Railroad*, 72 Mo. 50; *Powell v. Railroad*, 76 Mo. 82; *Stepp v. Railroad, supra*.

As to the actual speed of the box cars, four out of the five witnesses who were near enough to them to intelligibly testify concerning it, say as follows: Lynch, five or six miles an hour along by the water tank; Anderson, as fast as a common horse would trot; Scott, five or six, or may be seven, miles an hour; Clayton, a man, perhaps, could walk as fast as cars were going; Horn, another witness in the vicinity, was not asked his opinion as to their rate of speed. The witnesses Bridges and Ferrill were nearly a quarter of a mile distant from the box cars and could form no rational estimate of the speed of those cars, as the cars were coming toward them. But the former says they were going about as fast as a good horse would trot, and the latter says their speed was eight or ten miles an hour. How little of probative force or value is to be placed on such long-range testimony is shown by the opinion of BRACE, J., in *Shaw v. Railroad*, 104 Mo. 648. The rate of speed, then, of the cars can not be placed above seven miles per hour.

They were separated, as before stated, from the engine and other cars, a quarter of a mile west of the crossing, and the distance they were kept apart and the care in so keeping them apart, is shown by the fact that the engine and cars had reached the brick yard, when the box cars reached the crossing.

That the bell on the engine was ringing as required by statute for eighty rods before reaching the highway crossing, is testified to by Roberts, the fireman, and is undenied. In such cases, as has been ruled, the giving of signals does not apply to detached portions of a train. *Rafferty v. Railroad*, 91 Mo. 33. Besides, the statute in such instances is penal, and, therefore, to be strictly construed.

So that no statutory duty can be claimed to have been violated, by failing to give signals from the box

cars in the usual way, even if the means had been pro-
vided therefor.    If no statutory duty has been vio-
lated, then no statutory negligence could follow; for
the latter is only a logical sequence of the former.

But signals *were* given by the conductor just so
soon as he became at all apprehensive that the plaintiff
might, perhaps, attempt to cross in front of his cars;
these were given so loudly and so constantly as to arrest
the attention of four disinterested witnesses, at four
different points of the compass, whose respective dis-
tances varied from fifty to five hundred feet from the
*res gestæ.*

Looking, they all saw the cars, the conductor, and
the plaintiff in the wagon, and at the same time heard
him shouting to her.    Scott says he paid no attention
as to which way plaintiff was looking; Anderson says
he did not see her looking either way; Horn says that
she was looking down east, suppose she was watching
the engine and cars that had passed down east; Clayton
says he saw her in the wagon, and she was looking
east; Lynch, the conductor, says she was looking
straight ahead.

Clayton says he is acquainted with the locality,
and that, if she had looked around to the west at the
time he saw her, she would have seen the box cars
approaching; and all the witnesses concede that it
is beyond doubt that the moment she reached the
northeast corner of the coal shed, she could have seen
them for a quarter of a mile.    He says, also, that he did
not see her look toward the west till these cars were
*almost to her;* when they were within a few feet of her,
she threw her head around and slapped the horses with
the lines; and this testimony fully corroborates that of
Lynch, for the latter in response to the question, "Did
she look around towards you," says, "Just before she
got on the crossing she looked around and saw the

cars, and commenced to slap the horses with the lines.''
This testimony of Clayton and Lynch is also partially
corroborated by that of Anderson, who says: ''I saw
her give the lines a kind of jerk when she got pretty
near over the track.'' So that we have the testimony
of two witnesses that plaintiff looked constantly east-
ward; and of two witnesses that she looked straight
ahead; never looked to right or left, and of one witness
that he paid no attention as to which way she was
looking, and of two witnesses that she never looked
west until just as the cars were about to strike her on
the crossing, when she threw her head around and
slapped the horses with the lines.

*To these assertions she interposes no denial.* She
says she did not hear anything or see anything but the
cars that had passed; she does not pretend to say, nor
does she say, that she saw the cars that struck her.
Repeated and leading questions failed signally to elicit
an affirmative answer from her on the point desired.
The substance of her testimony on the subject has
already been set forth; but two representative extracts
from it will be inserted here.

In answer to the leading question of her counsel,
''Did you look up the track?'' she replied, ''*Well, I
don't say for sure that I looked, but I always do look, and
I think I must have looked that time; if I failed to look
that time it was the first time.*''

This answer was not quite sufficient or satisfactory,
and so she was pressed with another question: ''Well,
give the jury the best of your knowledge about that?''
and thereupon, ''*still asking her conscience whether she
should,*'' she was enabled to say this: ''Well, I always
look before I drive on the track, and if I failed to look
that time it was the first; *but to the best of my knowledge
I looked each way.*''

At an earlier period her deposition was taken by

defendant, and then a response to the question: "Are you sure you looked up to the left hand to see if there were any cars before crossing?" She answered, "*Well, seeing them cars pass on, I would not say for sure that I looked, for I thought, of course, they had passed on.*"

Such testimony as this was wholly worthless; it should have been stricken out on motion; but in the circumstances already related, showing in the clearest possible manner the physical facts and surroundings of this accident, her testimony even if she had *distinctly affirmed that she looked* west, should be held for naught; because it is undenied, and an undeniable fact in this case, that, if she had looked, she would have seen; if she had listened she would have heard; unless, indeed, the hood over her ears prevented the latter. A single turn of the head, a single glance of the eye upon the track, would have revealed in an instant her great danger. The head did not turn; the eye did not glance.

This matter of denying probative force, even to direct and affirmative testimony, when such testimony is plainly at war with the physical facts and surroundings, has passed into precedent. Thus, in the leading case of *Artz v. Railroad*, 34 Iowa 153, it is said:

"But, it is urged by the appellee's counsel that the plaintiff testifies that he did both look and listen to see and hear the train, but did not; and that this testimony shows that he was not guilty of contributory negligence, or, at the very least, it made that a question of fact for the jury. The difficulty, however, with the position is, that, the conceded or undisputed facts being true, this testimony can not, in the very nature of things, be true. It constitutes, therefore, no conflict. Suppose the fact is conceded that the sun was shining bright and clear at a specified time, and a witness having good eyes should testify that at the time he looked and did not see it shine. Could this testimony be true?

The witness may have been told that it was necessary to prove in the case that he did look and did not see the sun shine; he may have thought of it with a desire that it should have been so; he may have made himself first believe it was so, and this belief may have ripened into a conviction of its verity, and, possibly, he even may testify to it in the self-consciousness of integrity. But, after all, in the very nature of things, it can not be true, and hence can not, in the law, form any basis for a conflict upon which to rest a verdict. A man may possibly think he sees an object which has no existence in fact, but which it may be difficult, if not impossible, to prove did not exist or was not seen. But an object and power of sight being conceded, the one may not negative the other.

"In this case the plaintiff had good eyes; the train was approaching him in the night, with the engine's headlight burning brightly; if the plaintiff looked, he must have seen it, or he must have looked very negligently and carelessly—in either case, he was necessarily, in the eyes of the law, guilty of contributory negligence, precluding his right to recover."

So, also, in *Marland v. Railroad*, 16 Atl. Rep. 623, speaking of the present matter under investigation, the supreme court of Pennsylvania, said: "On the trial of this case the plaintiff testified that he stepped upon the track, and was instantly struck and injured. It is true, he said he looked up and down the track, and saw nothing; but it is necessarily true, also, that, if he made use of his eyesight, he must have seen the approaching train. He could not possibly look along the track in the direction of the approaching train and fail to see it, since his presence on the track and the collision were simultaneous. We have pronounced emphatically upon such facts in several of our recent cases. In *Carroll v. Railroad Co.*, 12 Wkly. Notes Cas.

348, we said:   'The injury received by the plaintiff was attributable solely to his own gross carelessness.   It is in vain to say that he looked and listened, if, in despite of what his eyes and ears must have told him, he walked directly in front of a moving locomotive.' "

In the more recent case of *Myers v. Railroad*, 24 Atl. Rep. 747, WILLIAMS, J., said: "The rule is now well settled in this state that one approaching a railroad crossing upon a public highway must stop, look and listen, at a convenient distance from the railroad track, before venturing to go upon it.   This rule is imperative.   If one disregards it, and suffers injury in the attempt to cross, the presumption of negligence on his part is a presumption *juris et de jure*.   Having contributed to his own injury, he is remediless.   If the traveler complies with the rule, and can see or hear a moving train approaching the crossing, what must he do? It follows logically from the rule now so firmly established that he must wait for the approaching train to pass.   If he does not do so, he crosses at his peril. *   *   *   If he does not wait, but risks his safety on his own calculation of the chances that he will be able to cross the track before the train can reach him, he must not complain of the consequences, if his calculation fails and disaster overtakes him.   *   *   *   In this case we encounter another question.   The plaintiff says he complied with the rule.   At about fifteen or twenty feet from the track he says he stopped his team, looked each way along the railroad, and listened; and that he neither saw nor heard a train approaching. He then drove on, and while upon the track was struck and injured.   If this is true, he did all the rule requires, and all that was possible to be done.   Is it true?   This question the court below left to the jury, and they promptly found that it was true.   The defendant asked the court to say as a matter of law that upon the

facts of this case it was not true.  Our question is,
whether this instruction should have been given.  The
facts, as shown by the plaintiff's case, are these:
(a)  The track was straight and smooth and unob-
structed, so that, from the crossing, or the point
where the plaintiff says he stopped to look and listen,
it could be seen for more than half a mile in either
direction.  (b)  The speed of the train was from
ten to twelve miles per hour.  (c)/ The engine was
running backwards, with a large reflecting headlight
perched upon the top of the tender, facing towards the
crossing, and another in its usual place on the front of
the engine.  *  *  *  It is absolutely certain from the
plaintiff's own testimony that the headlight upon the
tender, at the time he says he stopped, could not have
been, on any estimate of the rates of speed, more than
two or three hundred feet away, and in plain view.  If
he had stopped and listened he must have heard the
noise of the train.  If he had looked, the blazing head-
light would have confronted him, for it was squarely
in his line of vision, throwing its glare over intervening
objects, and making the darkness on either side darker
by the contrast.  The fact that four or five seconds
after he says he looked and listened he was struck by a
train that must have been plainly visible, and almost
on him at the time he alleges he looked, is so palpably
and absolutely irreconcilable with the truth of his
statement that he did stop, look both ways, and listen,
before driving upon the crossing, that it is trifling with
justice to permit a jury to find that it is true.  Such a
finding is absurd.  It is simply and flatly impossible ·
that one can stop, look, and listen for an approaching
train that is in plain view and close at hand, and be
unable to see or hear it, if he possesses the senses of
sight and hearing.  It seems, therefore, necessary to
advance one step in the application of the doctrine of

legal presumption, and to lay it down as a rule that one who is struck by a moving train which was plainly visible from the point he occupied when it became his duty to stop, look, and listen, must be conclusively presumed to have disregarded that rule of law and of common prudence, and to have gone negligently into an obvious danger. A line of well considered cases leads fairly up to this conclusion."

"If a traveler, by looking, could have seen an approaching train in time to escape, it will be presumed, in case he is injured by collision, either that he did not look, or, if he did look, that he did not heed what he saw. Such conduct is held negligence *per se*." Beach on Contributory Negligence [2 Ed.], sec. 182. To the same effect see Wharton on Negligence [2 Ed.], sec. 382.

Even in criminal cases, cases involving liberty or life, we have repeatedly ruled that, if a party testifies directly in the face of, and in opposition to, obvious physical facts, neither courts nor juries are bound to stultify themselves by giving credence to such testimony. *State v. Anderson*, 89 Mo. 332; *State v. Bryant*, 102 Mo. 24; *State v. Turlington*, 102 Mo. 642; *State v. Nelson*, 118 Mo. 124; *State v. Brown*, 119 Mo. 527.

Under these authorities, and under the facts heretofore recited, it seems "*quite unreasonable*" to say that plaintiff did look west at any time, except the moment before the cars struck her wagon, when she turned her head and slapped her horses with the lines, as testified to both by Lynch and Clayton, and partly confirmed by the testimony of Anderson.

Besides, the object of plaintiff's testimony was to show that defendant was negligent and she free from that fault; but *negligence is an affirmative fact* to be established by proof (*Rutledge v. Railroad*, 24 S. W. Rep.

VOL. 122—38

1053), or at least by reasonable inference drawn from proved facts, but here every surrounding fact, and, consequently, every reasonable inference which can be drawn therefrom, is repugnant to the idea that plaintiff could not have seen had she looked, or heard had she listened, and whenever this is the case the presumption will arise that she did not look or did not listen. *Smedis v. Railroad*, 88 N. Y. 13; *Johnson v. Railroad*, 77 Mo. 546, and cases *supra.* In such cases, knowledge and the means of knowledge are terms of tantamount legal import.

As to plaintiff's not being able to see the box cars before she passed the coal bin, the testimony of the *unimpeachable sun* on that point, as displayed in the photographs taken, is simply overwhelming, to say nothing of careful measurements and accurate experiments as to what could or could not be seen from different localities around the scene of the accident. Contrasted with such accurate measurements, mere surmises and conjectures go for nothing. See *Shaw v. Railroad*, *supra.*

Under the facts and circumstances, then, of this case, it should be ruled that plaintiff was guilty of such palpable contributory negligence as to bar her of any recovery.

And, even if defendant should also be held guilty of negligence, this should not affect the result, for, "It is not essential to this defense that the plaintiff should have been, in any degree, the cause of the act by which he was injured. It is enough to defeat him if the injury might have been avoided by his exercise of ordinary care. The question to be determined in every case is not, whether the plaintiff's negligence *caused*, but whether it *contributed* to, the injury of which he complains. This it may do by exposing him to the risk of injury, quite as effectually as if he committed the very act

which injured him. Neither is it necessary that the plaintiff's negligence should have contributed to the injury in any greater degree than the negligence of defendant." 1 Shearman & Redfield on Negligence [4 Ed.], sec. 96.

But I have discovered no negligence on the part of defendant in this record. Its duty only sprang into being *after* the conductor learned that plaintiff was in a position of peril. *Prewitt v. Eddy*, 115 Mo. 283 and cases cited. As to the box cars being detached from the rest, that point has heretofore been sufficiently considered and the distinction pointed out between the cases cited and those flying-switch cases, which this case was supposed to resemble. And surely the conductor was not bound to *anticipate* that plaintiff would so disregard all the promptings of prudence as rashly to attempt to cross the track in front of the moving train. *Purl v. Railroad*, 72 Mo. 168; *Railroad v. Manly*, 58 Ill. 300. And when he did become aware of her not-to-be-anticipated rashness, he manifestly did all that lay in his power to prevent her from being injured. He certainly set two of the brakes; for he so testifies, and there is testimony which supports his, and only testimony on the other side, to wit, that the witnesses did not see, etc.

Moved by the foregoing reasons, I am fully persuaded that defendant was not guilty of any negligence in the premises, or conceding its guilt, still the plain, palpable contributory negligence of plaintiff, must defeat her recovery, "*unless*," as remarked by Judge BRACE, "*the doctrine of contributory negligence is to be entirely discarded*." *Boyd v. Railroad*, 105 Mo. 371.

3. The next point to be considered is the conflict between the instructions given by the court of its own motion, and those given at request of plaintiff, which proceed on one theory, and instruction 19 given at the

instance of defendant proceeds on a widely different theory; they are irreconcilable. And it has been asserted in the second deliverance herein that such repugnancy in the different series of instructions constitutes reversible error.

In *Bluedorn's case*, 108 Mo. *loc. cit.* 450, it is said that "it is reversible error to give conflicting instructions, *no matter at whose instance they are given*." Similar expressions are indulged in in this case, and certain cases cited from our own reports to substantiate that assertion, cases which will now be examined.

In *Pond v. Wyman*, 15 Mo. 175, Pond recovered judgment against Wyman, and the latter appealed; certain instructions were given at the instance of plaintiff and others, by the court, of its own motion, *to all of which defendant excepted*, and the court refused all of the instructions asked by him, and the judgment was reversed, *not because of an error committed at the instance of the losing party*, but because of error committed by the *court* in giving instructions for plaintiff at the request of the latter, and then instructions of its own motion, which two series of instructions were *contradictory*, but to the giving of which *defendant excepted*, and in the matter of their giving had neither lot nor parcel.

In *Wood v. Steamboat*, 19 Mo. 529, it would seem *all* the instructions were given *by the court of its own motion;* certainly the fourth and erroneous one was, which was not only erroneous but inconsistent with itself in its two clauses, for which the judgment was reversed.

In *Henschen v. O'Bannon*, 56 Mo. 289, plaintiffs recovered judgment, and defendant appealed. For plaintiff, one instruction was given which was technically erroneous, and two for defendant, which were correct. Complaint was made in this court by the

unsuccessful party, of the erroneous instruction given
at the instance of his adversary; but this court held
that the technical error of plaintiff's instruction was
cured by those given for defendant, because the
instructions should be taken together.

In *Stevenson v. Hancock*, 72 Mo. 612, plaintiff had
judgment; defendant appealed; an *erroneous* instruc-
tion was given for *plaintiff* which conflicted with a
correct one given on defendant's request, and this was
the chief and proper ground for reversal, and so the
loose remark that, "for this reason, if for no other,
the judgment must be reversed," does not possess
much authoritative value, even though it be held to
mean that if an error be committed at the instance of
a successful party in the court below, by giving an
erroneous instruction, such error will be remedied in
this court, where a correct instruction was given at the
instance of the *unsuccessful* party; for this would be
done in such case, even, if no correct instructions were
given at the instance of such unsuccessful party.

In *Price v. Railroad*, 77 Mo. 508, plaintiff had
judgment.  Defendant's second, third, fourth and
fifth instructions, given at its instance, "properly
declared the law to the jury," but the first given for
plaintiff was in direct conflict with those for defend-
ant, *the appealing party*, and the judgment was reversed
on that and other grounds.

In *Frederick v. Allgaier*, 88 Mo. 598, plaintiff had
judgment; *erroneous* instructions given on *his request;*
correct one by the court of its own motion; conflict
between them, and judgment on *that* account reversed.
*Stone v. Hunt*, 94 Mo. 475, is a parallel case to the
previous one.

So that none of those cases give the slightest coun-
tenance to the theory that a defendant, defeated in the
lower court, can, in the upper court, reverse the judg-

ment because an *erroneous* instruction given at *his* instance conflicts with one or more *correct* ones given at the instance of his adversary, or by the court, of its own motion. To permit such a thing would be to allow a party to take advantage of his own error, or, what is tatamount thereto, for this court to do it for him.

This view is supported by the case of *Reardon v. Railroad*, 114 Mo. 384, wherein it was ruled that, if an erroneous instruction is asked by defendant and given, which instruction is at variance with correct instructions given for plaintiff, "defendant is estopped from complaining of an inconsistency of its own creation." To the same effect is *Wilkins v. Railroad*, 101 Mo. *loc. cit.* 105 where it is said: "As defendant requested the instruction in a form submitting the question of negligence of deceased as an issue of law, it can not complain that the submission * * * of such an issue was inconsistent with the plaintiff's first instruction, in which that question was properly submitted as one of fact."

Now, if defendant is *estopped to complain, can this court complain for him?* Surely not. But there are other decisions which sustain the views now being expressed. Thus, numerous rulings of this court attest that we will not consider objections to the action of the lower court which were not made the basis of a motion for a new trial. *Cowen v. Railroad,* 48 Mo. 556; *Matlock v. Williams*, 59 Mo. 105; *Haynes v. Trenton*, 108 Mo. 123; *Gordon v. Gordon*, 13 Mo 215; *Broughton v. Brand*, 94 Mo. 169, and other cases. How can this court disregard this well settled rule, and, without giving the lower court an opportunity to correct the supposed error, go behind the motion for a new trial and reverse the judgment? In this case the point was not made in defendant's motion for a new

trial, that there was any conflict between the instruction asked on its part and other instructions.

Moreover, it is not allowed to a defendant to raise any objections to instructions, unless such party shows by the record that *exceptions* were taken at the time the instructions were given. *State v. Elvins*, 101 Mo. 243; *Powers v. Allen* 14 Mo. 367; *Dozier v. Jerman*, 30 Mo. 216, and other cases.

Defendant would *hardly except to the giving of its own instruction*, nor did it do so. Can this court, despite this failure, of *its own motion*, raise an exception for the first time in this court? On these authorities and all reasonable deductions therefrom, I am not prepared to approve the doctrine announced in *Bluedorn's case*, and I do not believe a single case can be found which supports it.

4. In relation to the number of instructions asked by defendant, the bill of exceptions shows this:

"And thereupon the defendant, by its counsel, then prayed the court to give the following instructions numbered 1 to 23 inclusive, in words and figures following:" (Then followed *in haec verba* instructions 22 in number.)

"Of which said instructions the court gave those numbered 16, 17, 18, 19, 20, 21, 22 and 23, and refused those numbered 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14 and 15. To which said action of the court in refusing said instructions numbered 1 to 15, inclusive, the defendant, by its counsel, then and there at the time duly excepted."

Inasmuch as the twenty-two instructions are *literally set forth* the call for the twenty-third instruction may be rejected on the principle of the maxim, *"Falsa demonstratio non nocet."* 2 Sm. Lead. Cas., 468 *et seq.*; 1 Glf. on Evid., sec. 301. And another maxim is also *apropos* this point, to wit: *"Præsentia corporis tollit errorem*

*nominis.*" *Regina v. Mellor*, 27 L. J. (Mag. Cas.) 121. When the subject of a transaction is *actually and corporally present*, the calling of the object by a *wrong name*, or by the *wrong number*, such *misnomer* or *misnumber* is immaterial.

In this case the evidence was ample whereby to amend the bill of exceptions; the roll of instructions was complete, not fragmentary, so that all the instructions appear to have been in the clerk's office at the time the proceedings to amend were had.

It seems strange, therefore, that the circuit court did not, on the facts ascertained, order the bill to be amended. The two important matters of practice heretofore commented on, I have thought it proper to notice, but I have not thought it necessary to notice other errors alleged as, as already stated, I am well satisfied, both on reason and authority, that plaintiff has no cause of action, and that the judgment should simply be reversed.

BRACE, J., concurs in the third and fourth paragraphs of this opinion, but not in the first and second, BURGESS, J., in all the paragraphs, except the first and second.